# EXHIBIT B

**Asset Purchase Agreement**

**(attached)**

01:14551889.1

OC\1706118.15

Execution Copy
CONFIDENTIAL

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## OCZ TECHNOLOGY GROUP, INC.,

## EACH OF THE SUBSIDIARIES OF OCZ TECHNOLOGY GROUP, INC.

## LISTED ON THE SIGNATURE PAGES HERETO,

## AND

## TOSHIBA CORPORATION

## DATED AS OF DECEMBER 2, 2013

OC\1697932.15

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................1

    Section 1.1    Definitions.........................................................................1
    Section 1.2    Construction.....................................................................16

ARTICLE II PURCHASE AND SALE ...................................................................17

    Section 2.1    Purchase and Sale of Assets..............................................17
    Section 2.2    Excluded Assets ...............................................................19
    Section 2.3    Assumed Liabilities .........................................................21
    Section 2.4    Excluded Liabilities .........................................................21
    Section 2.5    Assumption and Assignment of Contracts..........................24
    Section 2.6    Additional and Eliminated Assumed Contracts ...................25
    Section 2.7    Allocation.......................................................................25

ARTICLE III PURCHASE PRICE ........................................................................25

    Section 3.1    Purchase Price; Closing Payment .....................................25
    Section 3.2    Withholding ....................................................................26

ARTICLE IV THE CLOSING ..............................................................................26

    Section 4.1    Time and Place of the Closing ..........................................26
    Section 4.2    Deliveries by the Seller ....................................................26
    Section 4.3    Deliveries by the Buyer ...................................................27

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE SELLING
    ENTITIES .................................................................................28

    Section 5.1    Organization, Standing and Corporate Power ....................28
    Section 5.2    Subsidiaries ....................................................................28
    Section 5.3    Authority Relative to this Agreement .................................29
    Section 5.4    No Violation; Consents.....................................................29
    Section 5.5    Legal Proceedings and Orders .........................................30
    Section 5.6    Compliance with Law......................................................30
    Section 5.7    Seller SEC Reports; Financial Statements; Liabilities; Accuracy .............30
    Section 5.8    Benefit Plans; Employees and Employment Practices .............32
    Section 5.9    Labor Matters.................................................................34
    Section 5.10    Contracts........................................................................35
    Section 5.11    Intellectual Property........................................................36
    Section 5.12    Taxes.............................................................................38
    Section 5.13    Insurance .......................................................................40
    Section 5.14    Assets; Real Property.......................................................41
    Section 5.15    Environmental Matters.....................................................41
    Section 5.16    Permits ..........................................................................42
    Section 5.17    Inventory .......................................................................42

OC\1697932.15

Section 5.18    Accounts and Notes Receivable and Payable ...........................................42
Section 5.19    Products............................................................................................42
Section 5.20    Foreign Corrupt Practices Act ...........................................................43
Section 5.21    Banks.................................................................................................43
Section 5.22    Brokers...............................................................................................43
Section 5.23    No Other Agreements to Sell the Acquired Assets.................................43

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER ........................44

Section 6.1    Organization and Good Standing.........................................................44
Section 6.2    Authority Relative to this Agreement ..................................................44
Section 6.3    No Violation; Consents.......................................................................45
Section 6.4    Legal Proceedings and Orders ............................................................45
Section 6.5    Brokers ...............................................................................................45

ARTICLE VII COVENANTS OF THE PARTIES ........................................................45

Section 7.1    Conduct of Business of the Selling Entities..........................................45
Section 7.2    Access to and Delivery of Information; Maintenance of Records.............48
Section 7.3    Expenses .............................................................................................50
Section 7.4    Further Assurances..............................................................................50
Section 7.5    Public Statements...............................................................................51
Section 7.6    Governmental Authority Approvals and Cooperation ...........................51
Section 7.7    Employee Matters ...............................................................................52
Section 7.8    Tax Matters ........................................................................................54
Section 7.9    Submission for Bankruptcy Court Approval ........................................55
Section 7.10    Overbid Procedures; Adequate Assurance...........................................57
Section 7.11    Termination Fee ..................................................................................58
Section 7.12    Transfer of Purchased Assets...............................................................58
Section 7.13    Post-Closing Operation of the Seller; Name Changes............................58
Section 7.14    Non-Competition; Non-Solicitation ...................................................59
Section 7.15    Intercompany Arrangements...............................................................60
Section 7.16    Damage or Destruction ......................................................................60
Section 7.17    Permits ...............................................................................................60
Section 7.18    Suppliers and Distributors; Certain Avoidance Actions; Insurance
                Policies................................................................................................60
Section 7.19    Notification of Certain Matters............................................................61
Section 7.20    Collection of Accounts Receivable.......................................................62
Section 7.21    Cure Payments; Cure of Defaults. .......................................................62
Section 7.22    Post-Closing Assignment of Contracts .................................................63
Section 7.23    Notification of Competing Bids............................................................63

ARTICLE VIII CONDITIONS TO CLOSING................................................................63

Section 8.1    Conditions to Each Party's Obligations to Effect the Closing.................63
Section 8.2    Conditions to Obligations of the Buyer ................................................64
Section 8.3    Conditions to Obligations of the Selling Entities ..................................65

Section 8.4    Frustration of Closing Conditions.............................................................66

ARTICLE IX TERMINATION; WAIVER..................................................................................66

Section 9.1    Termination...............................................................................................66
Section 9.2    Procedure and Effect of Termination.........................................................69
Section 9.3    Extension; Waiver.....................................................................................69

ARTICLE X MISCELLANEOUS PROVISIONS ......................................................................70

Section 10.1    Amendment and Modification .................................................................70
Section 10.2    Survival..................................................................................................70
Section 10.3    Notices ...................................................................................................70
Section 10.4    Assignment ............................................................................................71
Section 10.5    Severability ............................................................................................71
Section 10.6    Governing Law .......................................................................................72
Section 10.7    SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL .........72
Section 10.8    Counterparts...........................................................................................73
Section 10.9    Incorporation of Schedules and Exhibits ................................................73
Section 10.10   Entire Agreement ...................................................................................73
Section 10.11   Remedies................................................................................................73
Section 10.12   Mutual Drafting; Headings; Information Made Available ......................73
Section 10.13   Seller Disclosure Schedule ....................................................................74
Section 10.14   No Third Party Beneficiaries. ................................................................74
Section 10.15   Bulk Sales Law. .....................................................................................74

SCHEDULES

| | |
|---|---|
| 1.1(a) | Excluded Insurance Policies |
| 1.1(b) | October Balance Sheet |
| 2.2 | Other Excluded Assets |
| 2.5(a) | Assumed Agreements and Assumed Real Property Leases |
| 8.2(i) | Certain Business Employees |
| 8.2(j) | Required Consents |

Seller Disclosure Schedule

| | |
|---|---|
| 5.2(a) | Subsidiaries |
| 5.2(d) | Permanent Establishments |
| 5.4(b)(i) | Governmental Authority Consents |
| 5.4(b)(iii) | Governmental Authority Consents – Permits |
| 5.7(c) | Indebtedness |
| 5.8 | Seller Benefit Plans |
| 5.8(f) | Foreign Plans |
| 5.9 | Current Employees |
| 5.9(f) | COBRA Liabilities |
| 5.10(a)(i) | Material Contracts |
| 5.10(a)(ii) | Real Property Leases |
| 5.10(d) | Credit Support |
| 5.11(a) | Intellectual Property |
| 5.13 | Insurance Policies |
| 5.16 | Permits |
| 5.21 | Banks |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assumption Agreement |
| Exhibit B | Form of Bidding Procedures and Bidding Procedures Order |
| Exhibit C | Form of Bill of Sale and Assignment Agreement |
| Exhibit D | Form of Intellectual Property Assignment Agreement |
| Exhibit E | Form of Sale Order |
| Exhibit F | Forms of Buyer DIP Facility and Interim DIP Order |
| Exhibit G | Form of Buyer Retention Plan |

OC\1697932.15

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of December 2, 2013 by and among OCZ Technology Group, Inc., a Delaware corporation (the "Seller"), each of the subsidiaries of the Seller listed on the signature pages hereto (together with the Seller, the "Selling Entities"), and Toshiba Corporation, a Japanese corporation (the "Buyer"). Each of the Selling Entities and the Buyer are referred to herein individually as a "Party" and together as the "Parties."

## RECITALS

WHEREAS, the Selling Entities are preparing to file Chapter 11 bankruptcy petitions pursuant to the Bankruptcy Code in the Bankruptcy Court; and

WHEREAS, the Buyer desires to purchase from the Selling Entities, directly and/or, in the Buyer's sole discretion, through one or more Buyer Designees, and the Selling Entities desire to sell to the Buyer and/or such Buyer Designees, substantially all of the Selling Entities' assets, and the Buyer desires to assume from the Selling Entities, directly and/or, in the Buyer's sole discretion, through one or more Buyer Designees, certain specified liabilities, in each case pursuant to the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.  A defined term has its defined meaning throughout this Agreement and in each Exhibit and Schedule to this Agreement, regardless of whether it appears before or after the place where it is defined.  As used in this Agreement, the following terms have the meanings specified below:

"Accounts Receivable" means any and all (i) accounts receivable, notes receivable and other amounts receivable owed to the Selling Entities or the Acquired Subsidiaries (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Actions pertaining to the collection of amounts payable, or that may become payable, to the Selling Entities or Acquired Subsidiaries with respect to products sold or services performed on or prior to the Closing Date, (ii) construction allowances and other amounts due from landlords (including in respect of prior overcharges and insurance recoveries), (iii) license and royalty receivables, (iv) rebate receivables from suppliers, (v) insurance claims receivables (other than claims receivable under the Excluded Insurance Policies), and (vi) other amounts due to the Selling Entities or Acquired Subsidiaries which they have historically classified as accounts receivable in the consolidated balance sheet of the Seller.

"Acquired Subsidiaries" means OCZ Canada, Inc., OCZ Israel, Ltd., and OCZ Technology, Limited.

"Advisory Agreement" means an Advisory Agreement for the provision of reasonable advisory services by Buyer or a Buyer Designee to the Selling Entities after the Closing in connection with the Transitional Supply Agreement, in form and substance reasonably acceptable to Buyer.

"Action" means any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Legal Proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity.

"Affected Assets" has the meaning given to such term in Section 7.16.

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such specified Person. For purposes of this definition, "control" (and any similar term) means the power of one or more Persons to direct, or cause the direction of, the affairs of another Person by reason of ownership of voting stock or by contract or otherwise.

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and schedules, in each case as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Allocation" has the meaning given to such term in Section 2.7.

"Alternative Transaction" means (i) a Restructuring Transaction or (ii) one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Purchased Assets to any Person (or group of Persons), whether in one transaction or a series of transactions, in each case other than (A) to the Buyer or an Affiliate of the Buyer or (B) sales of Inventory in the ordinary course of business of the Selling Entities.

"Antitrust Laws" has the meaning given to such term in Section 7.6(b).

"Assumed Agreements" has the meaning given to such term in Section 2.1(e).

"Assumed Real Property Leases" has the meaning given to such term in Section 2.1(f).

"Assumed Liabilities" has the meaning given to such term in Section 2.3.

"Assumption Agreement" means one or more Assumption and Assignment Agreements to be executed and delivered by the Buyer or one or more Buyer Designees, and the Selling Entities at the Closing, substantially in the form of Exhibit A.

"Auction" has the meaning given to such term in Section 7.10(a).

"Audited Financial Statements" means the consolidated financial statements of the Seller contained in the Annual Report on Form 10-K/A for the fiscal year ended February 28, 2013, filed by the Seller with the SEC on October 7, 2013.

OC\1697932.15

2

"Avoidance Actions" means any and all preference or avoidance claims or actions which a trustee, a debtor-in-possession or other appropriate party in interest may assert on behalf of any Selling Entity or its Estate under applicable Law, including actions arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" means the cases to be commenced under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court by each Selling Entity.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court having competent jurisdiction over the Bankruptcy Case.

"Base Purchase Price" means $35,000,000.

"Bidding Procedures and Sale Motion" means one or more motions and notices filed by the Selling Entities, in each case in form and substance acceptable to the Buyer in its sole discretion, and served on creditors and parties in interest, in accordance with the Bidding Procedures Order, other orders of the Bankruptcy Court, the Federal Rules of Bankruptcy Procedures and local rules of the Bankruptcy Court, which motion(s) seeks, among other things, (i) authority from the Bankruptcy Court for the Selling Entities to enter into this Agreement and to consummate the transactions contemplated by this Agreement and (ii) entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court, substantially in the form of Exhibit B or otherwise acceptable to the Buyer in its sole discretion, approving, among other matters, payment of the Buyer Expense Reimbursement and the Termination Fee in accordance with Sections 7.3 and 7.11.

"Bill of Sale" means one or more Bill of Sale and Assignment Agreements to be executed and delivered by the Selling Entities to the Buyer or one or more Buyer Designees at the Closing, substantially in the form of Exhibit C.

"Business" means the business conducted by the Seller, the Selling Entities and the Acquired Subsidiaries as generally described in the Audited Financial Statements, other than (a) the Excluded Business and (b) to the extent excluded pursuant to Section 10.1 hereof, the Transitional Supply Business.

"Business Day" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by Law to be closed in New York, New York or Tokyo, Japan.

"Business Employees" means all Current Employees, other than any employees engaged primarily in the Excluded Business.

"Buyer" has the meaning given to such term in the Preamble hereto.

OC\1697932.15

"Buyer Advance Amount" means any and all amounts advanced to the Selling Entities from and after November 27, 2013 by Buyer or its Affiliates, including, without limitation, the Buyer DIP Amount.

"Buyer Cure Amount Cap" has the meaning given to such term in Section 7.21.

"Buyer Cure Payment Allocation" has the meaning given to such term in Section 7.21.

"Buyer Designee" means one or more Person(s) designated by the Buyer in writing to the Seller prior to the Closing.

"Buyer DIP Amount" means the aggregate amount of Indebtedness outstanding as of the Closing Date (without giving effect to the transactions contemplated hereby) under the Buyer DIP Facility.

"Buyer DIP Facility" means a credit facility, to be entered into substantially in the form of Exhibit F attached hereto, and as the same may be amended from time to time in accordance with the terms thereof and as permitted hereunder, provided by the Buyer or one or more Affiliates of the Buyer.

"Buyer Expense Reimbursement" means the sum of the aggregate amount of the Buyer's reasonable documented out-of-pocket costs and expenses (including expenses of outside counsel, accountants and financial advisors, which shall be based on summary invoices, redacted to preserve privileged or confidential information, and which shall not be required to comply with applicable United States Trustee guidelines) incurred by the Buyer in connection with or related to the Buyer's evaluation, consideration, analysis, negotiation, and documentation of a possible transaction with the Selling Entities or in connection with or related to the transactions contemplated by this Agreement, up to a maximum amount of $750,000.

"Buyer Retention Plan" means that certain Retention Bonus Plan of the Buyer or one or more Buyer Designees, to be effective as of the Closing, in substantially the form attached hereto as Exhibit G.

"Cash" means cash and cash equivalents and restricted cash of the Seller on a consolidated basis determined in accordance with the GAAP Accounting Principles.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning given to such term in Section 4.1.

"Closing Balance Sheet" means a consolidated balance sheet of the Seller as of the close of business on the day immediately preceding the Closing Date, without giving effect to the transactions occurring at Closing.

"Closing Date" has the meaning given to such term in Section 4.1.

"Closing Payment" has the meaning given to such term in Section 3.1(b).

4

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" means any bid contemplating an Alternative Transaction.

"Confidential Information" has the meaning given to such term in Section 7.2(d).

"Confidentiality Agreement" means the Mutual Nondisclosure Agreement, dated as of October 19, 2013, between the Buyer and the Seller.

"Consent" means any approval, consent, ratification, permission, waiver or authorization of any Person, or a Final Order of the Bankruptcy Court that deems, or renders unnecessary, the same.

"Contract" means any lease, contract, deed, mortgage, license or other legally enforceable agreement or instrument.

"Copyrights" means copyrights and all other rights with respect to Works of Authorship and all registrations thereof and applications therefor (including moral and economic rights, however denominated).

"Cure Payments" means the amount required to be paid with respect to each Non-Real Property Contract and Real Property Lease to cure all defaults under such Non-Real Property Contract or Real Property Lease to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by the Selling Entities and assignment to Buyer of each such Non-Real Property Contract and Real Property Lease.

"Current Employees" means all employees of the Selling Entities or Acquired Subsidiaries employed as of the Closing Date, whether active or not (including those on short-term disability or leave of absence, paid or unpaid), excluding any employees of the Selling Entities on long-term disability as of the Closing Date.

"Damage or Destruction Loss" has the meaning given to such term in Section 7.16.

"Databases" means databases and other compilations and collections of data or information.

"Debts" has the meaning set forth in Section 101(12) of the Bankruptcy Code.

"Designation Deadline" has the meaning given to such term in Section 2.6.

"DIP Facility Effective Date" means that date on which the Bankruptcy Court enters the Interim DIP Order or the Final DIP Order approving the Buyer DIP Facility and the Closing Date (as defined in the Buyer DIP Facility) under the Buyer DIP Facility has occurred.

"DIP Facility Execution Date" means that date on which the Buyer DIP Facility is executed by all of the parties thereto.

"DIP Lender" has the meaning set forth in the Buyer DIP Facility.

"Documentary Materials" has the meaning given to such term in Section 2.1(j).

"Domain Names" means domain names and uniform resource locators.

"Eliminated Agreement" has the meaning given to such term in Section 2.6.

"Encumbrances" means all mortgages, pledges, charges, liens (as defined in Section 101(37) of the Bankruptcy Code), Debts, interests, debentures, trust deeds, Claims, encumbrances, licenses, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting any right or title to the Purchased Assets or any part thereof or interest therein, in each case of any type, nature or kind whatsoever (whether known or unknown, secured or unsecured or in the nature of setoff or recoupment, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or nonmaterial, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, Law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability).

"Environmental Laws" has the meaning given to such term in Section 5.15.

"Equity Interests" has the meaning given to such term in Section 2.1(k).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any other Person (whether or not incorporated) that, together with such Person, would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Estate" means, with respect to any Selling Entity, the estate created pursuant to section 541 of the Bankruptcy Code.

"Excess Liabilities" means the excess of (1) the aggregate Liabilities of the Acquired Subsidiaries outstanding as of the Closing Date (which, for the avoidance of doubt, shall not include any intercompany liabilities among the Selling Entities and the Acquired Subsidiaries), less $500,000 and less any cash and cash equivalents of the Acquired Subsidiaries as of the Closing Date, over (2) the aggregate Liabilities of the Acquired Subsidiaries reflected on the October Balance Sheet (which, for the avoidance of doubt, shall not include any intercompany liabilities among the Selling Entities and the Acquired Subsidiaries).

6

OC\1697932.15

"Exchange Act" has the meaning given to such term in Section 5.7(a).

"Excluded Assets" has the meaning given to such term in Section 2.2.

"Excluded Business" means the power supply and power management business conducted by the Seller and the other Selling Entities as generally described in the Audited Financial Statements (it being understood and agreed that if the Acquired Subsidiaries hold any assets used solely in the Excluded Business such assets will be transferred to the Selling Entities prior to the Closing).

"Excluded Employees" has the meaning given to such term in Section 7.7(b).

"Excluded Insurance Policies" means all director and officer, fiduciary, employment practices and similar insurance policies maintained by or on behalf of any Selling Entity, including those listed on Schedule 1.1(a).

"Excluded Liabilities" has the meaning given to such term in Section 2.4.

"FCPA" has the meaning given to such term in Section 5.20.

"Final DIP Order" means a Final Order of the Bankruptcy Court approving the Buyer DIP Facility on a final basis, which shall be substantially in the form of the Interim DIP Order, with only those changes that are reasonably acceptable to Buyer; provided that those provisions of the Interim DIP Order that by their terms are subject to entry of Final DIP Order shall be effective upon entry of the Final DIP Order.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"Foreign Plan" has the meaning given to such term in Section 5.8(f).

"Former Employees" means all individuals who have been employed by the Selling Entities (or any of their predecessors) who are not Current Employees.

OC\1697932.15

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any federal, municipal, state, provincial, local or foreign governmental, administrative or regulatory authority, department, agency, commission or body (including any court or similar tribunal).

"Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"Indebtedness" of any Person means, without duplication, any of the following (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which are or would be payable in connection therewith): (a) all obligations of such Person for borrowed money or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services; (e) any obligations with respect to bank guarantees, deferred compensation arrangements, workers' compensation liabilities, employee medical liabilities, bonuses and any required statutory payments to employees; (f) all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; (g) all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any lien on, or security interest in, any property or asset of such Person (whether or not such obligation is assumed or guaranteed by such Person); and (h) all contingent obligations of such Person in respect of Indebtedness or obligations of other Persons of the kinds referred to in clauses (a) through (f) above.  For the avoidance of doubt, the Seller's Indebtedness shall include the Warrant Exchange Fee.

"Intellectual Property Rights" means any and all of the following rights (anywhere in the world, whether statutory, common law or otherwise and whether now known or hereafter existing under the Laws of any jurisdiction) and including, where applicable, all registrations and applications therefor: (i) Patents, including all members of the Patent Families of such Patents; (ii) Copyrights; (iii)  mask work rights; (iv) Trademarks; (v) rights with respect to Domain Names; (vi) Trade Secrets, including rights to limit the use or disclosure thereof by any Person; (vii) rights with respect to Databases; (viii) publicity and privacy rights, including all rights with respect to use of a Person's name, signature, likeness, image, photograph, voice, identity, personality, and biographical and personal information and materials; (ix) all claims and causes of action arising out of or related to any past, current or future infringement, misappropriation, interference or violation of any of the foregoing; and (x) any rights equivalent or similar to any of the foregoing.

8

"Interim DIP Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit F, with only those changes reasonably acceptable to Buyer.

"Inventory" means all inventory (including raw materials, component parts, products in-process and finished products) owned by any of the Selling Entities, whether in transit to or from the Selling Entities and whether in the Selling Entities' warehouses, distribution facilities, held by any third parties or otherwise.

"IP Assignment Agreement" means one or more Intellectual Property Assignment Agreements to be executed and delivered by the Selling Entities to the Buyer or one or more Buyer Designees at the Closing, substantially in the form of Exhibit D.

"IRS" means the United States Internal Revenue Service.

"Knowledge of Seller" or "Knowledge of the Selling Entities" means, as to a particular matter, the knowledge, after reasonable inquiry, of Rafael Torres, Ralph Schmitt, Alex Mei, James Tout, Daryl Lang, Jason Ruppert, Wayne Eisenberg or Cindee Van Vleck.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, ordinance, code, edict, decree, proclamation, treaty, rule, regulation, ruling, directive, pronouncement or requirement of any Governmental Authority.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits or legal proceedings (public or private) by or before a Governmental Authority.

"Liability" means any Claim, Debt, obligation, duty or liability of any nature, including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability, regardless of whether such claim, debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such claim, debt, obligation, duty or liability is immediately due and payable.

"Licensed Intellectual Property" means all Intellectual Property Rights and Technology licensed to the Selling Entities by third parties pursuant to the Assumed Agreements.

"Malicious Code" has the meaning given to such term in Section 5.11(g).

"Material Adverse Effect" means any event, condition, circumstance, development, or change or effect that, individually or in the aggregate with all other events, changes, conditions, circumstances, developments and effects, (a) has had or would reasonably be expected to have or result in a material adverse effect on the results of operations or financial condition of the Business or on the Purchased Assets and the Assumed Liabilities, taken as a whole, or (b) would reasonably be expected to prevent the Selling Entities from consummating the transactions contemplated by this Agreement except, in each case, for any such events, changes, conditions, circumstances, developments or effects resulting from or attributable to: (i) the announcement of the signing of this Agreement or the pendency of the transactions contemplated hereby, (ii) changes in Law or interpretations thereof by any Governmental Authority, (iii) changes in

generally accepted accounting principles in the United States or elsewhere, (iv) changes in general economic conditions, currency exchange rates or United States or international debt or equity markets, (v) events or conditions generally affecting the industry or markets in which the Selling Entities or the Acquired Subsidiaries operate, (vi) national or international political or social conditions or any national or international hostilities, acts of terror or acts of war, or (vii) the filing and prosecution of the Bankruptcy Case; *provided* that, in the case of clauses (iv) through (vi), such events, changes, conditions, circumstances, developments or effects shall be taken into account in determining whether any such material adverse effect has occurred to the extent that any such events, changes, conditions, circumstances, developments or effects have a disproportionate adverse effect on the Business, or the Purchased Assets and the Assumed Liabilities, taken as a whole, as compared to other similarly situated businesses.

"Material Contract" means each of the following Contracts to which any Selling Entity or Acquired Subsidiary is a party or is bound or which is binding on the Purchased Assets or used in connection with the Business:

(i)      that (x) limits in any material respect the freedom of a Selling Entity or of an Acquired Subsidiary to engage in any line of business or to compete with any other Person, or limits in any material respect the freedom of any "affiliate" of a Selling Entity or of an Acquired Subsidiary to engage in any line of business or to compete with any other Person; or (y) restrains, restricts, limits or impedes in any material respect the ability of any Selling Entity or of any Acquired Subsidiary to compete with or conduct any business or line of business in any geographic area, or restrains, restricts, limits or impedes in any respect the ability of any "affiliate" of a Selling Entity or of an Acquired Subsidiary to compete with or conduct any business or line of business in any geographic area;

(ii)      that contains minimum purchase or mandatory supply requirements, or that requires any Selling Entity or Acquired Subsidiary to deal exclusively with any Person with respect to any matter, or that provides "most favored nation" pricing or terms to the other party to such Contract or any third Person;

(iii)      any Contract relating to Indebtedness;

(iv)      any Contract relating to the sale or disposition of Purchased Assets (other than a sale or disposition of Inventory in the ordinary course of business);

(v)      any Contract to which any employee, officer or director of any Selling Entity or Acquired Subsidiary is bound which in any manner purports to restrict such employee's, officer's or director's freedom to engage in any line of business or to compete with any other Person;

(vi)      providing for the development of any material Software, other material Works of Authorship or Technology, and any Intellectual Property Rights thereto;

(vii)      that grants any ownership interest, any license, sublicense or other option or right to any Seller IP or by which the Company or a Company Subsidiary is required

10

to grant to any Person any right or license, any covenant not to assert/sue, release or other immunity from suit under or any other rights, to any Seller IP;

(viii)    pursuant to which a Selling Entity or Acquired Subsidiary is granted any license, covenant not to assert/sue or other immunity from suit under any rights to Intellectual Property Rights or Technology, with or without the right to sublicense the same, and which Intellectual Property Rights or Technology are used in, held for use in, or necessary for the conduct of the Business;

(ix)    any joint venture Contract, partnership agreement, limited liability company or other Contract (however named) involving a sharing of profits, losses, costs, or liabilities by any Selling Entity or Acquired Subsidiary with any other Person;

(x)    any Contract providing for payments to or by any Person or in excess of $100,000 in any 12 month period following the date hereof; or

(xi)    any other Contracts that is material to the Business or the Purchased Assets and the Assumed Liabilities, taken as a whole.

"Non-Real Property Contracts" means the Contracts to which any Selling Entity is a party, other than the Real Property Leases.

"Non-US Transferred Employee" has the meaning given to such term in Section 7.7(a).

"OCS" means the Office of the Chief Scientist of the Israeli Ministry of the Economy.

"October Balance Sheet" means the balance sheet for each Acquired Subsidiary as of October 31, 2013 (excluding any notes thereto) provided by Seller to Buyer and set forth on Schedule 1.1(b).

"Offeree" has the meaning given to such term in Section 7.7(a).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final, including any Order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

"Party" or "Parties" has the meaning given to such term in the Preamble hereto.

"Patents" means all patents worldwide, including utility models, industrial designs and design patents, and applications therefor (and any patents that issue as a result of those patent applications), and includes all divisionals, substitutions, continuations, continuations-in-part, continuing prosecution applications, reissues, re-examinations, renewals, restorations, and extensions, and any counterparts worldwide claiming priority therefrom, and all rights in and to any of the foregoing.

"Patent Family" means (i) all Patents in the same priority chain (i.e., all Patents that claim priority to the same non-provisional application or applications, and all Patents from which

priority is claimed by the identified Patent), (ii) all corresponding foreign Patents; and (iii) all Patents that are subject to a terminal disclaimer that disclaims the term of any such Patent beyond the term of any member of the family.

"Permits" means all franchises, permits, certificates, clearances, approvals and authorizations of or with any Governmental Authority held, used by, or made by, any of the Selling Entities in connection with the operation of the Business.

"Permitted Encumbrances" means: (a) liens for Taxes for the Post-Closing Tax Period that are not yet due and payable (but excluding any liens for Taxes arising on account of or relating to the Pre-Closing Tax Period), (b) immaterial statutory liens and rights of set-off of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen, customs brokers or agencies, suppliers and materialmen, and other Encumbrances imposed by Law, in each case, incurred in the ordinary course of business, (c) deposits and pledges securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits (other than valid obligations incurred in respect of any defined benefit pension plan) or (ii) obligations on performance, surety or appeal bonds, (d) non-exclusive licenses of, or other non-exclusive grants of, rights or permissions to use Seller IP granted to customers in the ordinary course of business, (e) Laws now or hereafter in effect relating to real property, easements and similar Encumbrances which do not interfere with the current use of such real property subject thereto by the Selling Entities or the Acquired Subsidiaries in any material respect, (f) statutory liens creating a security interest in favor of landlords with respect to property of the Selling Entities or the Acquired Subsidiaries which do not interfere with the current use of such leased real property by the Selling Entities or the Acquired Subsidiaries in any material respect, (g) Encumbrances set forth in the Assumed Agreements or the Assumed Real Property Leases, and (h) any Encumbrances effecting the landlords or ground lessors underlying interest in any of the Real Property Leases and/or the underlying interests in land from time to time, provided that such Encumbrances do not interfere with the current use of such real property subject thereto by the Selling Entities or the Acquired Subsidiaries in any material respect.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, syndicate, group, trust, association or other organization or entity or Governmental Authority. References to any Person include such Person's successors and permitted assigns.

"Petition" means the voluntary petition or petitions under Chapter 11 of the Bankruptcy Code filed by the Selling Entities with the Bankruptcy Court.

"Petition Date" means the date on which any of the Selling Entities first files the Petition.

"Post-Closing Tax Period" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"Professional Services" has the meaning given to such term in Section 2.4(e).

OC\1697932.15

"Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Purchase Price" has the meaning given to such term in Section 3.1(a).

"Purchased Assets" has the meaning given to such term in Section 2.1.

"Real Property Leases" means all leases, subleases and other occupancy Contracts with respect to real property to which any Selling Entity is a party.

"Registered IP" means all Seller IP that, as of the date of this Agreement, is registered, filed or issued under the authority of, with or by any Governmental Authority, including all Patents, registered Copyrights, registered mask works, registered Trademarks, registered Domain Names, and all applications for any of the foregoing.

"Representatives" means, with respect to a particular Person, any director, officer, manager, employee or other authorized representative of such Person or its Subsidiaries, including such Person's attorneys, accountants, financial advisors and restructuring advisors.

"Restricted Business" has the meaning given to such term in Section 7.14(a).

"Restructuring Transaction" means (i) any recapitalization transaction, plan of reorganization, liquidation, or sale, including any such transaction by way of a credit bid or by any creditor of any of the Selling Entities, involving, whether in whole or in part, any of the Selling Entities or all or any material portion of the Purchased Assets, or (ii) any merger, consolidation, share exchange, business combination or similar transaction involving, whether in whole or in part, any of the Selling Entities or all or any material portion of the Purchased Assets, in each case whether in one transaction or a series of transactions.

"Sale Hearing" means the hearing at which the Bankruptcy Court considers approval of the Sale Order pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

"Sale Order" means the order of the Bankruptcy Court, substantially in the form of Exhibit E or otherwise acceptable to the Buyer in its sole discretion, which, among other things, (i) approves, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Selling Entities of this Agreement, (B) the sale of the Purchased Assets to Buyer free and clear of all Encumbrances on the terms set forth herein, and (C) the performance by Selling Entities of their respective obligations under this Agreement; (ii) authorizes the Selling Entities to assume and assign to Buyer the Assumed Agreements and the Assumed Real Property Leases; (iii) finds that Buyer is not a successor to the Selling Entities, and (iv) finds that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grants Buyer the full protection provided thereby.

"SEC" has the meaning given to such term in the Preamble to ARTICLE V.

"Securities Act" has the meaning given to such term in Section 5.7(a).

"Seller" has the meaning given to the Preamble hereto.

13

OC\1697932.15

"Seller Benefit Plan" means any employment, consulting, noncompetition, nondisclosure, nonsolicitation, severance, termination, post-employment or retirement, workers' compensation, supplemental unemployment, excess benefit, profit sharing, bonus, incentive or deferred compensation, retention or change in control agreement, equity or equity-linked compensation, stock purchase, option, restricted unit, deferred unit, performance unit, unit appreciation, phantom unit, severance pay, defined benefit pension, defined contribution pension, savings, individual account-based savings, supplemental retirement, sick or other leave, life, health, salary continuation, disability, hospitalization, accident, medical, dental, cafeteria, flex spending, adoption/dependent/employee assistance, tuition, insurance, vacation, leave of absence, paid time off, long term care, welfare fringe benefit or other employee compensation or benefit plan, program, arrangement, agreement, fund, Contract, policy or commitment (including any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA)), entered into, sponsored, maintained or administered by or contributed to or required to be contributed to by any Selling Entity, any Subsidiary of any Selling Entity or any of its or their ERISA Affiliates for the benefit of any employee, consultant or other service provider of any Selling Entity (or any dependent or beneficiary thereof) or in which any employee, consultant or other service provider of any Selling Entity (or any dependent or beneficiary thereof) participates.

"Seller Disclosure Schedule" means the disclosure schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement.

"Seller Financial Statements" has the meaning given to such term in Section 5.7(b).

"Seller IP" means all rights, title and interest in and to any and all Intellectual Property Rights and Technology owned by, or claimed or purported by the Selling Entities to be owned by, the Selling Entities or Acquired Subsidiaries as of the Closing.

"Seller Properties" has the meaning given to such term in Section 5.14(b).

"Seller SEC Reports" has the meaning given to such term in Section 5.7(a).

"Selling Entities" has the meaning given to the Preamble hereto.

"Software" means any and all computer programs, operating systems, applications systems, firmware or software code of any nature, whether operational or under development, including all object code, source code, RTL code, Gerber files, GDSII files, executable code, data files, rules, definitions or methodology derived from the foregoing, and any derivations, updates, enhancements and customizations of any of the foregoing, and any related processes, know-how, APIs, user interfaces, command structures, menus, buttons and icons, flow-charts, and related documentation, operating procedures, methods, tools, developers' kits, utilities, developers' notes, technical manuals, user manuals and other documentation thereof, including comments and annotations related thereto, whether in machine-readable form, programming language or any other language or symbols and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature.

"Straddle Period" means any Tax period beginning before or on the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, (a) any corporation or similar entity of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation or similar entity, is held, directly or indirectly by such Person and (b) any partnership, limited liability company or similar entity of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership, limited liability company or similar entity.

"Tax" means all federal, state, provincial, local or foreign taxes (including any income tax, franchise tax, service tax, capital gains tax, capital tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, profits tax, inventory tax, capital stock tax, license tax, withholding tax, payroll tax, employment tax, social security tax, unemployment tax, employer health tax, severance tax, or occupation tax), escheat and abandoned property tax, levies, assessments, tariffs, duties (including any customs duties), deficiencies or fees (including any fine, addition, penalty or interest), imposed, assessed or collected by or under the authority of any Governmental Authority, including any interest, penalty or addition thereto, whether disputed or not, and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, by Contract or otherwise.

"Tax Return" means any return, report, information return or other document (including any related or supporting information and including any amendment thereof) supplied or required to be supplied to any Governmental Authority with respect to Taxes.

"Technology" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, Software, subroutines, techniques, user interfaces, web sites, Works of Authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Termination Fee" means an amount in cash equal to $1,050,000.

"Trade Secrets" means information and materials not generally known to the public and qualifying as a trade secret under applicable Law, including (i) any technical, engineering, manufacturing, product, marketing, servicing, financial, supplier, and other information and materials; and (ii) any customer, vendor, and distributor lists, contact and registration information, and correspondence.

"Trademarks" means trademarks, trade names, service marks, service names, logos and design marks, trade dress, fictitious and other business names and identifiers, brand names, collective membership marks, certification marks, slogans, 800 numbers, social media pages or designations, hash tags and other forms of indicia of origin, whether or not registrable as a

15

OC\1697932.15

trademark in any given jurisdiction, together with all goodwill associated with any of the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale and Assignment Agreement, the Buyer Retention Plan, the Buyer DIP Facility, the Transitional Supply Agreement (to the extent entered into pursuant to Section 10.1), the Advisory Agreement (to the extent entered into pursuant to Section 10.1), and any other Contract or document to be entered into by the Parties and/or one or more Buyer Designees, as applicable, at or in furtherance of the Closing.

"Transfer Taxes" has the meaning given to such term in Section 7.8(a).

"Transferred Employees" has the meaning given to such term in Section 7.7(a).

"Transitional Supply Agreement" means a Transitional Supply Agreement for the provision of the manufacturing and supply of certain finished goods in Taiwan after the Closing by the Selling Entities to Buyer and the Buyer Designees, in form and substance reasonably acceptable to Buyer.

"Transitional Supply Business" means the provision of goods and services by the Selling Entities to Buyer or one or more Buyer Designees after the Closing pursuant to the Transitional Supply Agreement, to the extent implemented pursuant to Section 10.1.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (1988) and any similar Laws, including Laws of any state, country or other locality that is applicable to a termination of employees.

"Warrant Exchange Fee" means the fee payable pursuant to the Second Amendment to the Loan and Security Agreement, dated as of August 13, 2013.

"Works of Authorship" means Software (whether in source code or object code form), websites, content, images, graphics, text, photographs, artwork, audiovisual works, sound recordings, graphs, drawings, reports, analyses, writings, and other works of authorship and copyrightable subject matter, and any modifications, improvements and derivative works of any of the foregoing.

Section 1.2    Construction. The terms "hereby," "hereto," "hereunder" and any similar terms as used in this Agreement refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. The terms "including," "includes" or similar terms when used herein shall mean "including, without limitation." The meaning of defined terms shall be equally applicable to the singular and plural forms of the defined terms, and the masculine gender shall include the feminine and neuter genders, and vice versa, unless expressly indicated otherwise. Any reference to any federal, state, provincial, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Any reference herein to "days" shall mean calendar days, unless Business Days are expressly specified. Unless otherwise indicated, references to (a) Articles, Sections, Schedules and Exhibits refer to Articles, Sections, Schedules and Exhibits of and to this Agreement and (b) references to $ (dollars) are to United States Dollars. The word

16

"or" when used in this Agreement is not meant to be exclusive unless expressly indicated otherwise.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Assets</u>.    Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing, the Selling Entities shall sell, assign, convey, transfer and deliver to the Buyer and/or one or more Buyer Designees, and the Buyer and/or such Buyer Designees shall, by the Buyer's and/or such Buyer Designees' payment of the Purchase Price, purchase and acquire from the Selling Entities, all of the Selling Entities' right, title and interest, free and clear of all Encumbrances (other than Permitted Encumbrances), in and to all of the properties, rights, interests and other tangible and intangible assets of the Selling Entities (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP) (collectively, the "<u>Purchased Assets</u>"), including any assets acquired by the Selling Entities after the date hereof but prior to the Closing; *provided, however*, that the Purchased Assets shall not include any Excluded Assets. Without limiting the generality of the foregoing, the Purchased Assets shall include the following (except to the extent listed or otherwise included as an Excluded Asset):

(a)    all Cash of the Selling Entities as of the Closing;

(b)    all Accounts Receivable of the Selling Entities as of the Closing;

(c)    all Inventory, supplies, materials and spare parts of the Selling Entities as of the Closing (including all rights of the Selling Entities to receive such Inventory, supplies, materials and spare parts that are on order) and all open purchase orders with suppliers;

(d)    without duplication of the above, all royalties, advances, prepaid assets (excluding prepaid Taxes of the Selling Entities), security and other deposits, prepayments and other current assets relating to the Business or the Purchased Assets, the Assumed Agreements and the Assumed Real Property Leases, in each case of the Selling Entities as of the Closing (but excluding all interests in the Excluded Insurance Policies and all prepaid assets relating to Contracts that are not Assumed Agreements or Assumed Real Property Leases as of the Closing);

(e)    all Non-Real Property Contracts, including Contracts related to Seller IP and Licensed Intellectual Property, that have been, or are intended to be, assumed by and assigned to the Buyer and/or one or more Buyer Designees pursuant to <u>Section 2.5</u> or <u>Section 2.6</u> (the "<u>Assumed Agreements</u>");

(f)    all Real Property Leases that have been, or are intended to be, assumed by and assigned to the Buyer and/or one or more Buyer Designees pursuant to <u>Section 2.5</u> or <u>Section 2.6</u> (the "<u>Assumed Real Property Leases</u>");

(g)    all Seller IP;

17

(h)    all open purchase orders with customers (to the extent there is sufficient Inventory as of the Closing Date to satisfy such orders or that are otherwise acceptable to Buyer in its sole discretion);

(i)    all items of machinery, equipment, supplies, furniture, fixtures, leasehold improvements (to the extent of the Selling Entities' rights to any leasehold improvements under the Assumed Real Property Leases) and other tangible personal property and fixed assets owned by the Selling Entities as of the Closing;

(j)    all books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Selling Entities as of the Closing (except as otherwise described in Section 2.2), including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business or the Purchased Assets, and, to the extent not prohibited under applicable Law, all files and data related to the Transferred Employees (collectively, the "Documentary Materials");

(k)    all of the stock or other equity interests owned by the Selling Entities in the Acquired Subsidiaries (the "Equity Interests"); provided that in the event any Acquired Subsidiary shall be liquidated prior to the Closing, the assets constituting the proceeds of such liquidation (and not the Equity Interests in respect of such liquidated Acquired Subsidiary) shall be Purchased Assets hereunder;

(l)    all claims (including claims for past infringement or misappropriation of Seller IP) and causes of action (other than, in each case, to the extent related to Excluded Assets or Excluded Liabilities) of the Selling Entities as of the Closing against Persons (including the Acquired Subsidiaries) other than the Selling Entities (regardless of whether or not such claims and causes of action have been asserted by the Selling Entities) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, possessed by the Selling Entities and Acquired Subsidiaries as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets;

(m)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller IP and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Selling Entities to the extent relating to the Business or the Purchased Assets;

(n)    all rights of the Selling Entities under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Current Employees, Former Employees or current or former directors, consultants, independent contractors and agents of any of the Selling Entities or any of their Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof);

(o)    all of the rights and benefits accruing under all Permits, all deposits and prepaid expenses (excluding prepaid Taxes of the Selling Entities) held by third parties and/or, to

OC\1697932.15

the extent transferable, any Governmental Authority and, to the extent transferable, all bank and deposit accounts;

(p)     the amount of, and all rights to any, insurance proceeds received by any of the Selling Entities (other than any amounts or rights to any insurance proceeds received under any Excluded Insurance Policy) after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(q)     any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff (other than against the Selling Entities) arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in the Excluded Insurance Policies);

(r)     all prepaid and deferred items (including prepaid real property tax but excluding prepaid Taxes of the Selling Entities) that relate to the Business or the Purchased Assets as of the Closing, including all prepaid rentals and unbilled charges, fees and deposits (but excluding all interests in the Excluded Insurance Policies);

(s)     to the extent transferable, all current and prior insurance policies of any of the Selling Entities that relate to the Purchased Assets or Assumed Liabilities, and all rights and benefits of any of the Selling Entities of any nature (except for any rights to insurance recoveries thereunder required to be paid to other Persons under any Order of the Bankruptcy Court relating to any debtor-in-possession financing obtained by the Selling Entities) with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, but excluding all interests in the Excluded Insurance Policies;

(t)     any rights, claims or causes of action as of the Closing of any Selling Entity relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses, and counterparties to any Assumed Agreement or Assumed Real Property Lease (including in each case the Acquired Subsidiaries) in respect of the assets, properties, conduct of business or operations of such Selling Entity arising out of events occurring on or prior to the Closing Date, including any Avoidance Actions that relate solely to any Purchased Assets or Assumed Liabilities;

(u)     any rights, claims or causes of action as of the Closing of any Selling Entity relating to or arising against the Buyer, any Buyer Designee, or any of their respective Affiliates, Subsidiaries, or Representatives, including any Avoidance Actions against any such Persons; and

(v)     all other assets that are related to or used in connection with the Business and that are owned or leased by any Selling Entity as of the Closing.

Section 2.2   Excluded Assets.  Notwithstanding any provision herein to the contrary, the Purchased Assets shall not include any of the following (collectively, the "Excluded Assets"):

OC\1697932.15

(a)     any records, documents or other information relating to Excluded Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate applicable Law;

(b)     the Selling Entities' (i) minute books and other corporate books and records relating to their organization and existence and the Selling Entities' books and records relating to Taxes of the Selling Entities, including Tax Returns filed by or with respect to the Selling Entities; and (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items relating to any Excluded Assets or Excluded Liabilities;

(c)     the Selling Entities' rights under this Agreement and the other Transaction Documents, and all consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof;

(d)     any Contracts of any Selling Entities relating to Indebtedness; and any Contracts between any Selling Entity, on the one hand, and any equity holder of Seller (including any Person who has the right to acquire equity of Seller, whether as the result of an exchange, conversion, exercise, or otherwise) in such Person's capacity as an equity holder of Seller, on the other hand (including any stock purchase, shareholders', registration rights or similar agreements);

(e)     any Contracts, together with all prepaid assets relating to such Contracts, of any Selling Entities (including employment Contracts), other than the Assumed Agreements and the Assumed Real Property Leases;

(f)     all rights, claims and causes of action of the Selling Entities against Persons other than the Acquired Subsidiaries and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery, including rights to insurance proceeds, of the Selling Entities (regardless of whether such rights are currently exercisable), in each case to the extent solely related to any Excluded Assets or Excluded Liabilities;

(g)     all rights, claims and causes of action of the Selling Entities against any director or officer of any Selling Entity and all Excluded Insurance Policies and interests in the Excluded Insurance Policies;

(h)     any shares of capital stock or other equity interests of any of the Selling Entities, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any of the Selling Entities;

(i)     Accounts Receivable, intercompany obligations and other amounts receivable, in each case of any Selling Entity owed to it by any other Selling Entity;

(j)     any prepaid Tax, Tax receivable or Tax refund of a Selling Entity with respect to any period ending on or prior to the Closing;

20

(k)     any Seller Benefit Plan or any right, title or interest in any assets of or relating thereto, or any assets relating to Excluded Liabilities described in Section 2.4(f) through (h), except as otherwise specifically provided in Section 7.7;

(l)     any Avoidance Actions that relate solely to any Excluded Assets or Excluded Liabilities, in each case subject to Section 7.18(b);

(m)     assets used solely in the Excluded Business; and

(n)     the Selling Entities' right, title and interest to the other assets, if any, set forth in Schedule 2.2.

Notwithstanding anything in this Agreement to the contrary, the Buyer may, in its sole and absolute discretion (without any adjustment to the Purchase Price), at any time on or prior to the date that is one Business Day before the Closing Date, elect not to acquire any of the assets, properties and rights of the Selling Entities, and any asset so designated by the Buyer on Schedule 2.2 (which the Buyer may update from time to time by delivering the updated Schedule 2.2 to the Seller) shall be an Excluded Asset for all purposes hereunder; *provided, however,* that with respect to Assumed Agreements and Assumed Real Property Leases, such designation shall be made in accordance with Section 2.5.

Section 2.3     Assumed Liabilities.  On the Closing Date, the Buyer and/or one or more Buyer Designees shall execute and deliver to the Selling Entities the Assumption Agreement pursuant to which the Buyer and/or such Buyer Designees shall assume and agree to pay, perform and discharge when due the Assumed Liabilities.  For purposes of this Agreement, "Assumed Liabilities" means only the following Liabilities (to the extent not paid or discharged prior to the Closing) and no others:

(a)     the Liabilities of the Selling Entities arising under the Assumed Agreements and the Assumed Real Property Leases; *provided, however,* that the Buyer and Buyer Designees shall not assume or agree to pay, discharge or perform any Liabilities of any Selling Entities under or with respect to any Assumed Agreements and Assumed Real Property Leases, including Liabilities arising out of any breach, misfeasance or under any other theory to the extent relating to Selling Entities' conduct prior to the Closing;

(b)     the Liabilities of the Selling Entities arising in the ordinary course of business under purchase orders with suppliers that are Purchased Assets open as of the Closing Date;

(c)     the Liabilities expressly assumed by the Buyer pursuant to Section 7.7; and

(d)     Taxes to the extent expressly payable by the Buyer pursuant to Section 7.8(b).

Section 2.4     Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, the Parties expressly acknowledge and agree that neither the Buyer nor any Buyer Designee shall assume, be obligated to pay, perform or otherwise discharge or in any other

21

manner be liable or responsible for any Liabilities whatsoever of the Selling Entities, whether existing on the Closing Date or arising thereafter, other than the Assumed Liabilities (all such Liabilities that neither the Buyer nor any Buyer Designee is expressly assuming being referred to collectively as the "Excluded Liabilities"). Without limiting the foregoing, the Buyer shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any of the Selling Entities or of any predecessor of any of the Selling Entities, whether incurred or accrued before or after the Petition Date or the Closing:

(a)       any Liability arising out of facts or circumstances in existence prior to the Closing Date and from or related to any breach, default under, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges, underpayments or penalties on the part of the Seller or any of its Affiliates under any Contract, agreement, arrangement or understanding to which the Seller or any of its Affiliates is a party prior to the Closing Date;

(b)       any Liability arising from or related to the operation or condition of the Purchased Assets prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing;

(c)       any Liability arising from or related to the operation of the Business or the Seller's products prior to the Closing Date, including any Liability relating to design or manufacturing defects and any warranty, product liability, safety and other Liability relating to any product sold or manufactured by the Seller prior to the Closing;

(d)       all Taxes of the Selling Entities (or Taxes of any branch offices of any Selling Entity), including Taxes imposed on the Selling Entities under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign Tax law, other than Taxes expressly payable by the Buyer pursuant to Section 7.8(b);

(e)       all Liabilities of the Selling Entities relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby or otherwise on behalf of the Selling Entities, and any pre-Petition or post-Petition Claims for such Professional Services, including any brokerage fees, commissions, finders or similar fees incurred by any Selling Entity in connection with the transactions contemplated by this Agreement;

(f)       all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan;

(g)       except, in each case, to the extent expressly assumed by Buyer pursuant to Section 7.7, all Liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of the Selling Entities (or any predecessor) of any individual Person (including the Transferred Employees) or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by this

22

Agreement), including Liabilities or claims for wages, remuneration, compensation, vacation, paid time off, benefits, workers' compensation, severance (including statutory severance), separation, termination, unfair labor practice, discrimination, classification, or notice pay or benefits (including under COBRA, except to the extent required by applicable Treasury Regulations issued under COBRA), claims under the WARN Act, or any other form of accrued or contingent compensation (including leave entitlements), irrespective of whether such Liabilities or claims are paid or made, as applicable, on, before or after Closing;

(h)     all Liabilities with respect to any Excluded Employee or Former Employee with respect to any period;

(i)     all Liabilities relating to Excluded Assets;

(j)     all accounts payable and other amounts payable of any Selling Entity owed by it to any other Selling Entity or any Acquired Subsidiary and all Liabilities arising as a result of effecting the matters set forth in Section 7.15;

(k)     all Liabilities of the Selling Entities arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by any Selling Entity, whether or not used in the Business, including any Liabilities for noncompliance with Environmental Laws or the release of hazardous materials by any Selling Entity on or prior to the Closing, whether known or unknown as of the Closing;

(l)     all Liabilities arising from or related to any claim, action, arbitration, audit, hearing, investigation, suit, litigation or other proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against any Selling Entity or any of their respective Affiliates, or related to the Purchased Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date;

(m)     all Liabilities of the Selling Entities in respect of Indebtedness;

(n)     all Liabilities arising in connection with any violation of any applicable Law or Order relating to the period prior to the Closing;

(o)     all Liabilities for fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Seller or any of its Subsidiaries, or any of their respective directors, officers, or employees;

(p)     all Liabilities to any equityholder of any Selling Entity;

(q)     all Liabilities arising from state or bankruptcy law theories of recovery, including fraudulent transfer;

(r)     subject to Section 7.21, all Cure Payments;

(s)     all costs and expenses payable in connection with obtaining any Consents; and

(t)    any other Liability of the Selling Entities that arises in relation to the period prior to the Closing and is not expressly included among the Assumed Liabilities.

Section 2.5    Assumption and Assignment of Contracts.

(a)    (i)    Promptly, but in any event, within ten (10) days from the date hereof, Seller shall deliver Schedule 2.5(a) to the Buyer, which Schedule shall contain with respect to each Non-Real Property Contract and Real Property Lease of the Selling Entities, the Seller's good-faith best estimate, as certified by the Chief Executive Officer or Chief Financial Officer of Seller, of the amount of Cure Payments with respect to each such Non-Real Property Contract and Real Property Lease; provided, however, that from and after the date of delivery of Schedule 2.5(a) hereunder until five (5) Business Days prior to the Sale Hearing, the Seller may provide updates or supplements to Schedule 2.5(a) to include Non-Real Property Contracts or Real Property Leases entered into after the date hereof in compliance with the terms of this Agreement and/or to include revised Cure Payments with respect to any Non-Real Property Contracts or Real Property Leases set forth therein, which updates shall amend Schedule 2.5(a) for all purposes hereof.  Prior to the Sale Hearing, the Seller shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Assumed Agreement or Assumed Real Property Lease entered into prior to the Petition Date.  Notwithstanding the foregoing, at any time and from time to time prior to the Closing, the Buyer may identify any Assumed Agreement or Assumed Real Property Lease as one that the Buyer no longer desires to have assigned to it or its designee in accordance with Section 2.6.  Subject to Section 7.21, payment of all Cure Payments for each Non-Real Property Contract and Real Property Lease that is assumed and assigned to Buyer or Buyer Designees shall be the sole responsibility of the Selling Entities, irrespective of the aggregate amount of such Cure Payments (whether reflected on Schedule 2.5(a) or otherwise) and shall be paid by Seller within one (1) Business Day following the Closing Date from the Purchase Price.

(ii)    At the Closing, the Selling Entities shall assume and assign to the Buyer and/or, as applicable, one or more Buyer Designees the Assumed Agreements and Assumed Real Property Leases, in each case pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by the Buyer of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment of the Cure Payments in respect of Assumed Agreements and Assumed Real Property Leases as contemplated hereby.  The Cure Payments in respect of all of the Assumed Agreements and Assumed Real Property Leases shall be borne by the Seller, shall be paid by the Seller from the Purchase Price, and shall not be the obligation, liability or responsibility of Buyer or any Buyer Designee.  The Seller shall be solely responsible for the payment, performance and discharge when due of the Liabilities under the Assumed Agreements and Assumed Real Property Leases arising or otherwise payable on or prior to the Closing Date, and such Liabilities shall not be the obligation, liability or responsibility of Buyer or any Buyer Designee.

(b)    If, following the Closing, any Selling Entity receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then such Selling

24

OC\1697932.15

Entity shall transfer such asset, property or right to the Buyer and/or, as applicable, one or more Buyer Designees as promptly as practicable for no additional consideration.

(c)    If, following the Closing, the Buyer receives or becomes aware that it holds any asset, property or right which constitutes an Excluded Asset, then the Buyer shall transfer such asset, property or right to the Seller as promptly as practicable for no additional consideration.

Section 2.6    Additional and Eliminated Assumed Contracts. Notwithstanding anything in this Agreement to the contrary, the Buyer may, from time to time and in its sole and absolute discretion, amend or revise Schedule 2.5(a) in order to add or eliminate any Non-Real Property Contract or Real Property Lease to or from such Schedule up to one (1) Business Day prior to the Closing Date (the "Designation Deadline") and, for any particular Assumed Agreement or Assumed Real Property Lease that will be assumed in whole or in part by a Buyer Designee, to identify such Buyer Designee.  Automatically upon the addition of any Non-Real Property Contract or Real Property Lease to Schedule 2.5(a) by the Buyer in accordance with the previous sentence, it shall be an Assumed Agreement or Assumed Real Property Lease, as applicable, for all purposes of this Agreement.  Automatically upon the deletion of any Non-Real Property Contract or Real Property Lease from Schedule 2.5(a) by the Buyer in accordance with the first sentence of this Section 2.6 (any such deleted Non-Real Property Contract or Real Property Lease, an "Eliminated Agreement"), it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by the Buyer or any Buyer Designee or be the obligation, liability or responsibility of Buyer or any Buyer Designee. If any Contract is added to the list of Assumed Agreements or Assumed Real Property Leases, then the Selling Entities shall take such steps as are reasonably necessary, including payment of all Cure Payments, to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing.

Section 2.7    Allocation.  The Buyer shall, within ninety (90) days following the Closing Date, deliver to the Seller an allocation of the Purchase Price (and the Assumed Liabilities, to the extent properly taken into account under the Code) among the Purchased Assets and the covenants contained in Section 7.14 (the "Allocation") in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder.  Within thirty (30) days following the Seller's receipt of the Allocation, the Seller may notify and provide the Buyer with any comments to the Allocation.  The Buyer shall consider in good faith any reasonable comments to the Allocation so provided by the Seller.  The Parties agree to file all Tax Returns (including the filing of Form 8594 with their United States federal income Tax Return for the taxable year that includes the date of the Closing) consistent with the Allocation unless otherwise required by applicable Law.

**ARTICLE III**
**PURCHASE PRICE**

Section 3.1    Purchase Price; Closing Payment.

(a)    In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, at the Closing, the Buyer and/or one or more Buyer Designees

shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay in accordance with <u>Section 3.1(b)</u> an aggregate amount equal to (x) the Base Purchase Price, *minus* (y) the Buyer Advance Amount, *minus* (z) the aggregate amount of the Excess Liabilities (such amount, the "<u>Purchase Price</u>").

(b)    On the Closing Date, the Buyer shall pay or caused to be paid to the Seller, by wire transfer of immediately available funds to an account designated by the Seller prior to the Closing, an amount in cash equal to (i) the Purchase Price, *plus* (ii) the Buyer Cure Payment Allocation (such amount, the "<u>Closing Payment</u>").

Section 3.2    <u>Withholding</u>.  The Buyer shall be entitled to withhold from any amount otherwise payable to any of the Selling Entities or any other Person under this Agreement any withholding Taxes required by applicable Law to be withheld from the amounts so payable. Any amount so withheld and paid over to the appropriate Governmental Authority pursuant to this <u>Section 3.2</u> shall be deemed to have been paid over to the applicable Selling Entities or other Persons for all purposes of this Agreement.

## ARTICLE IV
## THE CLOSING

Section 4.1    <u>Time and Place of the Closing</u>.  Upon the terms and subject to the satisfaction of the conditions contained in <u>ARTICLE VIII</u> of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of the Buyer's counsel, Costa Mesa, California at 10:00 a.m. (Pacific time) no later than the second (2nd) Business Day following the date on which the conditions set forth in <u>ARTICLE VIII</u> have been satisfied or, to the extent permitted, waived by the applicable Party in writing (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted, waiver of such conditions at or prior to the Closing), or at such other place and time as the Buyer and the Seller may mutually agree.  The date on which the Closing actually occurs is herein referred to as the "<u>Closing Date</u>."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. (Pacific time) on the Closing Date.

Section 4.2    <u>Deliveries by the Seller</u>.  At or prior to the Closing, the Seller shall deliver the following to the Buyer:

(a)    the Bill of Sale, duly executed by the Selling Entities;

(b)    the Assumption Agreement, duly executed by the Selling Entities;

(c)    the IP Assignment Agreement, duly executed by the applicable Selling Entities;

(d)    such other instruments of assignment or conveyance duly executed by the applicable Selling Entities as shall be reasonably requested or reasonably necessary to transfer the Purchased Assets to the Buyer in accordance with this Agreement;

(e)    a copy of the Sale Order as entered by the Bankruptcy Court;

26

(f)     the certificate contemplated by Section 8.2(c);

(g)     a properly executed certificate of non-foreign status prepared in accordance with Treasury Regulations Section 1.1445-2(b) from each Selling Entity organized within the United States;

(h)     certificates representing all of the Equity Interests, duly endorsed (or accompanied by duly executed stock or similar powers) by the Selling Entity owning such Equity Interests in blank or for transfer to the Buyer or a Buyer Designee, if such Equity Interests are certificated, and all other appropriate instruments, resolutions, filings, certificates and confirmations necessary to transfer such Equity Interests to the Buyer and any applicable Buyer Designees;

(i)     copies of the certificate of incorporation and bylaws (or equivalent governance documents) of the Acquired Subsidiaries;

(j)     to the extent necessary pursuant to applicable Law, certified copies of the resolutions duly adopted by the Acquired Subsidiaries authorizing the sale of all of the equity interests of such entity and the other transactions contemplated hereby;

(k)     evidence, reasonably acceptable to the Buyer, that the insurance policies that constitute Purchased Assets, to the extent transferable, have been assigned to the Buyer or a Buyer Designee;

(l)     if required pursuant to Section 10.1, the Transitional Supply Agreement and the Advisory Agreement, each duly executed by the applicable Selling Entities; and

(m)     to the extent requested by the Buyer, written resignations from each director and officer of the Acquired Subsidiaries, effective as of the Closing.

Section 4.3     Deliveries by the Buyer.  At or prior to the Closing, the Buyer shall deliver the following to the Seller:

(a)     the Closing Payment;

(b)     the Assumption Agreement and the IP Assignment Agreement, duly executed by the Buyer and, to the extent applicable, one or more Buyer Designees;

(c)     such other instruments of assumption duly executed by the Buyer and/or any applicable Buyer Designees as shall be reasonably requested or reasonably necessary for the Buyer and/or any applicable Buyer Designees to assume the Assumed Liabilities in accordance with this Agreement; and

(d)     the certificate contemplated by Section 8.3(c).

27

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE SELLING ENTITIES

Subject to (a) such exceptions as are disclosed (subject to <u>Section 10.13</u>) in the Seller Disclosure Schedule delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement, and (b) such exceptions as result directly from the filing and commencement of the Bankruptcy Case, the Selling Entities jointly and severally represent and warrant to the Buyer as of the date hereof and as of the Closing Date as follows:

Section 5.1    <u>Organization, Standing and Corporate Power</u>.  Each Selling Entity and each Acquired Subsidiary is a corporation or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, formation or organization. Each Selling Entity and each Acquired Subsidiary is duly qualified or licensed to do business in each jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification or licensing necessary, except to the extent that any such failure to be qualified or licensed would not be material to the Business, the Purchased Assets or the Assumed Liabilities.

Section 5.2    <u>Subsidiaries</u>.

(a)    <u>Section 5.2(a)</u> of the Seller Disclosure Schedule identifies (i) each direct and indirect Subsidiary of the Seller, its jurisdiction of formation, and all owners of equity interests of each such Subsidiary and the number or percentage of equity interests owned by each such owner and (ii) all equity interests that are owned directly or indirectly by the Seller of Persons who are not direct or indirect Subsidiaries of the Seller.  Except as set forth in <u>Section 5.2(a)</u> of the Seller Disclosure Schedule, all of the outstanding capital stock of, or other ownership interests in, each Selling Entity (other than the Seller) and all of the Equity Interests are owned beneficially and of record by the Seller, directly or indirectly.  Except as set forth in <u>Section 5.2(a)</u> of the Seller Disclosure Schedule, the Selling Entities own no other equity interests in any other Person.

(b)    All of the Equity Interests have been duly authorized and are validly issued, fully paid and nonassessable and will be free and clear of any Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against the Equity Interests following the Closing in accordance with the Sale Order) and were not issued in violation of any preemptive or similar rights.

(c)    There are no currently outstanding or authorized options, warrants, rights, contracts, rights of first refusal or first offer, calls, preemptive rights, puts, rights to subscribe, conversion rights, or other agreements or commitments to which any Selling Entity or Acquired Subsidiary is a party or which are binding upon any Selling Entity or Acquired Subsidiary providing for the issuance, disposition, or acquisition of the capital stock of any of the Acquired Subsidiaries or securities convertible into or exchangeable for the capital stock of any Acquired Subsidiary.  There are no (i) outstanding obligations of any Acquired Subsidiary to repurchase, redeem or otherwise acquire any of its capital stock or (ii) voting trusts, proxies or other agreements among the stockholders of any Acquired Subsidiary with respect to the voting or

OC\1697932.15

transfer of its capital stock. There are no outstanding or authorized equity appreciation, phantom equity, or similar rights with respect to any Acquired Subsidiary.

(d)    Section 5.2(d) of the Seller Disclosure Schedule sets forth a true and complete list of each permanent establishment of any Selling Entity or any Acquired Subsidiary recognized under applicable Law in any non-U.S. jurisdiction.

Section 5.3    Authority Relative to this Agreement. Each of the Selling Entities has the requisite corporate or company power and authority to execute and deliver this Agreement and the other Transaction Documents to be executed and delivered by such Selling Entity prior to the Petition Date and to carry out the transactions contemplated hereby and thereby prior to the Petition Date. Each Selling Entity has the requisite corporate or company power and authority to execute and deliver the Transaction Documents to be executed and delivered by such Selling Entity on or after to the Petition Date pursuant to this Agreement and, subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions, but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance by each Selling Entity of the Transaction Documents to which such Selling Entity is a party have been duly authorized by all necessary action of such Selling Entity and subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), no other action on the part of such Selling Entity is required in connection therewith. The Transaction Documents to which a Selling Entity is a party, assuming due authorization, execution and delivery by the other parties hereto and thereto, constitute, or when executed and delivered by such Selling Entity will constitute subject to the entry by the Bankruptcy Court of the Bidding Procedures Order (in the case of Section 7.3 and Section 7.11 hereof and other provisions authorized pursuant thereto) and the Sale Order (in the case of all other provisions but solely with respect to actions to be taken following the Petition Date that require approval pursuant to the Sale Order to be effective), valid and binding obligations of such Selling Entity enforceable against such Selling Entity in accordance with their terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

Section 5.4    No Violation; Consents.

(a)    Except to the extent excused by or rendered unenforceable against the Selling Entities as a result of the Bankruptcy Case or the Sale Order, neither the execution and delivery of this Agreement nor the sale by any Selling Entity of any Purchased Assets pursuant to this Agreement or the other Transaction Documents will (with or without notice or lapse of time) (i) conflict with or result in any breach of any provision of any Selling Entity's or Acquired Subsidiary's certificate of incorporation or bylaws (or similar organizational documents), (ii) subject to the matters referred to in Section 5.4(b), violate, conflict with or result in any breach of any Law applicable to any Selling Entity, the Business, the Purchased Assets or any Acquired

Subsidiary, or (iii) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, Material Contract, agreement, lease, sublease, license, Permit, franchise or other instrument or arrangement to which any of the Selling Entities or any Acquired Subsidiary, is a party as of the Closing and which constitutes a Purchased Asset or Assumed Liability, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) as of the Closing on any of the Purchased Assets, except to the extent that any such rights of termination, amendment, acceleration, suspension, revocation or cancellation as a result of such Encumbrance will not be enforceable against such Purchased Asset or Assumed Liability following the Closing in accordance with the Sale Order.

(b)    No Consent of any Governmental Authority is required to be obtained by or with respect to any Selling Entity or any Acquired Subsidiary, in connection with the execution, delivery and performance of this Agreement or any Transaction Document to which any Selling Entity is a party, or the consummation by the Selling Entities of the transactions contemplated hereby or thereby, except for (i) the Consents set forth in Section 5.4(b)(i) of the Seller Disclosure Schedule, compliance with any applicable requirements of Antitrust Laws and compliance with any applicable requirements of applicable securities Laws, (ii) the entry of the Sale Order by the Bankruptcy Court, and (iii) Consents to the transfer or assignment of Permits that constitute Purchased Assets set forth in Section 5.4(b)(iii) of the Seller Disclosure Schedule.

Section 5.5    Legal Proceedings and Orders.    Other than in connection with the Bankruptcy Case, there is no material Legal Proceeding pending before any Governmental Authority, and no Person has threatened in writing to commence any such material Legal Proceeding, (a)(i) that relates to any of the Purchased Assets or (ii) is against or involving any Acquired Subsidiary, or (b) that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement. As of the date of this Agreement, there is no material outstanding Order to which any of the Selling Entities, any of the Purchased Assets, or any Acquired Subsidiary are subject.

Section 5.6    Compliance with Law.    Each of the Selling Entities and the Acquired Subsidiaries (i) has been (except as described in the Seller SEC Reports) since January 1, 2010, and is in material compliance with all Laws and Orders relating to the Purchased Assets (including the use thereof), the Assumed Liabilities and the conduct of the Business,  and (ii) has not received any written notice from any Governmental Authority, that has not been dismissed or otherwise finally resolved, that any violation of any such Law or Order exists.

Section 5.7    Seller SEC Reports; Financial Statements; Liabilities; Accuracy.

(a)    The Annual Report on Form 10-K/A for the fiscal year ended February 28, 2013 filed by the Seller with the SEC, and each report, schedule, form, statement or other document filed with the SEC after the filing of such Annual Report and prior to the date of this Agreement (collectively, the "Seller SEC Reports") (i) as of its date, complied as to form in all material respects with the applicable requirements of the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (the "Securities Act"), or the

30

United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "Exchange Act"), as the case may be, as in effect on the date so filed and (ii) did not, at the time it was filed (or, if subsequently amended or supplemented, at the time of such amendment or supplement), contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. As of the date of this Agreement, no Acquired Subsidiary is separately subject to the periodic reporting requirements of the Exchange Act.

(b)    Each of the consolidated financial statements of the Seller contained in the Annual Report on Form 10-K/A for the fiscal year ended February 28, 2013 and in the Quarterly Report on Form 10-Q/A for the quarterly period ended August 31, 2013 filed with the SEC (collectively, the "Seller Financial Statements") was prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act) and presents fairly, in all material respects, the consolidated financial position of the Seller as of the respective dates thereof and the consolidated statements of operations, stockholder's equity and cash flows of the Seller for the respective periods indicated therein (subject, in the case of unaudited financial statements, to normal period end adjustments).

(c)    Except for matters disclosed in the Seller SEC Reports (excluding any "risk factors" or forward looking statements or similar disclosure contained therein), since January 1, 2013, no Material Adverse Effect has occurred. The Selling Entities and the Acquired Subsidiaries do not have any Indebtedness or other Liabilities (whether accrued, absolute, contingent or otherwise) that were not disclosed or reserved against in the Seller Financial Statements (including the notes thereto), except for indebtedness or other Liabilities that (i) were incurred after August 31, 2013 in the ordinary course of business, (ii) were incurred under this Agreement or in connection with the transactions contemplated hereby, or (iii) will constitute Excluded Liabilities. All Indebtedness of the Selling Entities and the Acquired Subsidiaries as of the date hereof is set forth on Schedule 5.7(c).

(d)    None of the information supplied or to be supplied by or on behalf of the Selling Entities (i) to any Person for inclusion in any document or application filed with any Governmental Authority having jurisdiction over, or in connection with, the transactions contemplated by this Agreement and the Transaction Documents or (ii) to the Buyer or its Representatives in connection with, pursuant to, or contained in, this Agreement, the negotiations leading up to this Agreement, any Transaction Document, the Seller Disclosure Schedule or the exhibits, schedules, certificates, documents, written information or lists attached hereto or specifically referred to herein or otherwise in connection with the transactions contemplated by this Agreement or by such Transaction Documents, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to be stated herein or therein or that is necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading. To the Knowledge of Seller, there are no material facts pertaining to the Selling Entities, any Acquired Subsidiaries or the Business which have not been disclosed in this Agreement, the Seller Disclosure Schedule, the Seller SEC Reports or the Seller Financial Statements or otherwise disclosed to the Buyer by the Seller in writing. All documents required to be filed by the Selling Entities with any Governmental

31

Authority in connection with this Agreement or the transactions contemplated by this Agreement comply (or will comply) in all material respects with the provisions of applicable Law.

Section 5.8    Benefit Plans; Employees and Employment Practices.

(a)    Section 5.8 of the Seller Disclosure Schedule sets forth a complete and correct list of each Seller Benefit Plan and true, correct and complete copies of each material Seller Benefit Plan have been made available to the Buyer.

(b)    Except as set forth in Section 5.8(b) of the Seller Disclosure Schedule, (i) each Seller Benefit Plan has been maintained and administered in accordance with its terms and with all applicable provisions of ERISA, the Code and other applicable Laws, (ii) there are no audits, inquiries or proceedings pending or, to the Knowledge of any of the Selling Entities, threatened by the IRS or any other Governmental Authority with respect to any Seller Benefit Plan (other than routine claims for benefits in the ordinary course of business), (iii) no event has occurred and, to the Knowledge of Seller, there exists no condition or set of circumstances in connection with which Buyer could be subject to any Liability under the terms of, or with respect to, such Seller Benefit Plan, or under ERISA, the Code or any other applicable Law with respect to such Seller Benefit Plan, and (iv) all contributions, premiums and payments (including all employer contributions, employee contributions and salary deferral contributions elected by Current Employees and Former Employees) with respect to any Seller Benefit Plans that are due and owing or required to be made pursuant to such plans have been made by the due date thereof (including any valid extension), and all contributions, premiums and payments with respect to periods ending on or before the Closing Date (including periods from the first day of the current plan year or policy year to the Closing Date) which are not yet due have been, or as of the Closing will be paid or accrued on the Closing Balance Sheet. None of the Purchased Assets is, or could reasonably be expected to become, the subject of any Lien arising under ERISA or the Code, whether arising with respect to the operation, termination, restoration or funding of any Seller Benefit Plan, in connection with any excise Tax or penalty Tax with respect to any Seller Benefit Plan or otherwise.

(c)    No Seller Benefit Plan is, and neither the Selling Entities nor any of their respective ERISA Affiliates sponsors, maintains, contributes to, has ever sponsored, maintained or contributed to or has any Liability with respect to any (A) "multiemployer plan" (within the meaning of Section 3(37) of ERISA), (B) "multiple employer plan" (within the meaning of Section 413(c) of the Code), (C) "pension plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, (D) multiple employer welfare arrangement (within the meaning of Section 3(40) of ERISA), or (E) any plan which provides, or under which the Selling Entities or any ERISA Affiliates thereof have any Liability to provide, retiree or post-employment life insurance, medical, severance or other employee welfare benefits to any current or former Business Employee, except as required by Section 4980B of the Code or any similar applicable Legal Requirement.

(d)    Each Seller Benefit Plan that is intended to be qualified under Section 401(a) of the Code has timely received a favorable determination letter or is entitled to rely on a favorable opinion letter from the IRS, in either case, that has not been revoked and, to the

32

Knowledge of Seller, no event or circumstance exists that has adversely affected or would reasonably be expected to adversely affect such qualification or exemption.

(c)     Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement, either alone or in combination with another event (whether contingent or otherwise) will (i) entitle any Current Employee or other service provider of the Selling Entities to any payment or benefit; (ii) increase the amount or value of any payment, compensation or benefits due to any such Current Employee or other service provider; or (iii) accelerate the vesting, funding or time of payment or delivery of any compensation, equity award or other payment or benefit; (iv) result in any liability or obligation to or obligation or commitment by the Buyer or any of its Affiliates under or with respect to any Seller Benefit Plan to any Current Employee or Former Employee; or (v) result in any "parachute payment" within the meaning of Section 280G of the Code or any similar foreign, state or local Legal Requirements.

(f)     Each Seller Benefit Plan maintained or contributed to by any Selling Entity under the law or applicable custom or rule of the relevant jurisdiction outside of the United States (each such plan, a "Foreign Plan") is listed on Section 5.8(f) of the Seller Disclosure Schedule. As regards each Foreign Plan, (i) such Foreign Plan is, and has been operated, in material compliance with its terms and the provisions of the Laws of each jurisdiction in which such Foreign Plan is maintained, to the extent those Laws are applicable to such Foreign Plan, (ii) all contributions to, and material payments from, such Foreign Plan which may have been required to be made in accordance with the terms of such Foreign Plan, and, when applicable, the Laws of the jurisdiction in which such Foreign Plan is maintained, have been timely made or shall be made by the Closing Date, (iii) each Selling Entity and each ERISA Affiliate have materially complied with all applicable reporting and notice requirements, and such Foreign Plan has obtained from the Governmental Authority having jurisdiction with respect to such Foreign Plan any required determinations, if any, that such Foreign Plan is in compliance with the Laws of the relevant jurisdiction if such determinations are required in order to give effect to such Foreign Plan, (iv) to the Knowledge of the Company, there are no pending investigations by any Governmental Authority involving such Foreign Plan, and no pending claims (except for claims for benefits payable in the normal operation of such Foreign Plan), suits or proceedings against such Foreign Plan or asserting any rights or claims to benefits under such Foreign Plan, and (v) the consummation of the transactions contemplated by this Agreement will not by themselves create or otherwise result in any Liability with respect to such Foreign Plan. No Foreign Plan has unfunded Liabilities that will not be offset by insurance.

Section 5.9    <u>Labor Matters</u>.

(a)    <u>Section 5.9</u> of the Seller Disclosure Schedule contains a true, correct and complete list of the names and current annual salary rates or current hourly wages (as applicable), bonus opportunity, hire date, accrued vacation and paid-time-off, principal work location, employer and leave status of all Current Employees and each such Current Employee's status as being exempt or nonexempt from the application of state and federal wage and hour laws applicable to employees who do not occupy a managerial, administrative, or professional position. No Current Employee and no group of Current Employees or other service providers of any of the Selling Entities has informed any of the Selling Entities (whether orally or in writing) of any present intention to terminate employment with or services for any Selling Entities and, to the Knowledge of any of the Selling Entities, no such Person or Persons has any plans to terminate employment with or services for Seller or any Subsidiary.

(b)    None of the Selling Entities nor the Acquired Subsidiary is a party to, or otherwise bound by or subject to, any collective bargaining or other labor union contracts and no Current Employees are represented by any labor organization, trade union, works council, employee representative, employee congress or other form of employee association or representative. No labor organization (or representative thereof) or Current Employee or group of Current Employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of any of the Selling Entities, threatened to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, or provincial or foreign or other Governmental Authority. To the Knowledge of any of the Selling Entities, there is no organizing activity involving the Selling Entities or any of their Affiliates pending or threatened by any labor organization (or representative thereof) or employee or group of employees to organize Current Employees. There are no lockouts, slowdowns, work stoppages, strikes or other organized work interruptions pending, or threatened between the Selling Entities or any of their Affiliates, on the one hand, and their respective Current Employees, on the other hand, and there have been no such lockouts, slowdowns, work stoppages, strikes or other organized work interruptions for the past three (3) years.

(c)    As of the date of this Agreement and except as set forth in <u>Section 5.9(c)</u> of the Seller Disclosure Schedule, each of the Selling Entities and their Affiliates is in material compliance with all agreements, Contracts and Laws regarding (i) the terms and conditions of employment of Current Employees, Former Employees and prospective employees and (ii) other labor-related matters, including all Laws or court orders relating to wages, hours, pay equity, employment equity, conditions of employment, employment standards, human rights, employee privacy, the WARN Act, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding Taxes and/or social security Taxes and contributions and any similar Tax or contribution. Except as set forth in <u>Section 5.9(c)</u> of the Seller Disclosure Schedule, there has been no "mass layoff" or "plant closing" (as defined by the WARN Act), or "collective redundancy" or similar process (being a process under any foreign Law under which an employer is required by Law to follow a different process for the termination of more than one (1) employee when compared with the process for the termination of one (1) employee), with respect to the Selling Entities or any of their Affiliates within the six (6) months prior to Closing.

34

(d)     Each of the Selling Entities and their Affiliates has paid in full to their respective Current Employees, consultants and directors, all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such Current Employees, consultants or directors; (ii) there is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of Seller, threatened before any Government Entity with respect to any Persons currently or formerly employed by any of the Selling Entities and their Affiliates; and (iii) none of the Selling Entities and their Affiliates is a party to, or otherwise bound by, any consent decree with, or citation by, any Government Entity relating to their Current Employees or employment practices.

(e)     There are no notices of assessment, provisional assessment, reassessment, supplementary assessment, penalty assessment or increased assessment (collectively, "assessments") or any other communications related thereto which any Selling Entity has received from any workers' compensation or workplace safety and insurance board or similar authorities in any jurisdictions where the Business is carried on which are unpaid on the date hereof or which will be unpaid at the Closing Date and there are no facts or circumstances which may result in an increase in liability to any Buyer or any Buyer Designee under any applicable workers' compensation or workplace safety and insurance Law after the Closing Date.

(f)     Schedule 5.9(f) sets forth a true and complete list of the Liabilities of the Selling Entities under COBRA as of the date hereof.

Section 5.10     Contracts .

(a)     Section 5.10(a)(i) of the Seller Disclosure Letter sets forth a complete and accurate list of all Material Contracts. Section 5.10(a)(ii) of the Disclosure Letter sets forth a complete and accurate list of all Real Property Leases. The Seller has made available to the Buyer true and complete copies of all Material Contracts and Real Property Leases, including any amendments thereto.

(b)     Each Material Contract and each Real Property Lease is a valid and binding obligation of each Selling Entity or Acquired Subsidiary party thereto as applicable, and to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar Laws affecting or relating to enforcement of creditors' rights generally or general principles of equity.

(c)     None of the Selling Entities, Acquired Subsidiaries or, to the Seller's Knowledge, the other parties thereto, is in breach in any material respect of any Material Contract or any Real Property Lease, and none of the Selling Entities or the Acquired Subsidiaries have received any written notice of any such breach, except, in each case, (i) as a result of the Bankruptcy Case, or (ii) as will be cured upon entry of the Sale Order and payment of the Cure Payments.

(d)     Section 5.10(d) of the Seller Disclosure Letter sets forth a complete and accurate list of all outstanding letters of credit, banker's acceptances or similar credit support arrangements that secure any Assumed Liabilities of any Selling Entity.

OC\1697932.15

Section 5.11    Intellectual Property.

      (a)    Section 5.11(a) of the Seller Disclosure Schedule sets forth a complete and accurate list, as of the date hereof, of (i) each item of Registered IP in which any Selling Entity or Acquired Subsidiary has an ownership interest of any nature (whether exclusively, jointly with another Person or otherwise) and all actions, filings and payment obligations due to be made to any Governmental Authority within one hundred and eighty (180) days following the Closing Date, (ii) the jurisdiction in which each such item of Registered IP has been registered or filed and the applicable registration or serial number, (iii) any other Person that has an ownership interest in each such item of Registered IP, and (iv) all material unregistered Trademarks used in connection with any product of any Selling Entity or Acquired Subsidiary. No Selling Entity or Acquired Subsidiary has transferred ownership of (whether a whole or partial interest), or granted any exclusive right to use, any Seller IP to any Person.

      (b)    To the Knowledge of the Seller, all Seller IP is valid, subsisting, and enforceable. The Seller has made all filings and payments and taken all other actions required to be made or taken to maintain each item of Registered IP in full force and effect by the applicable deadline and otherwise in accordance with all applicable Laws. The Seller has provided to the Buyer complete and accurate copies of all applications, material correspondence to or from any Governmental Authority, and other material documents related to each such item of Registered IP. The Seller, and to the Knowledge of the Seller its patent counsel, have complied with their duty of candor and disclosure and have made no bad faith or material misrepresentations in the filings submitted to the applicable Governmental Authorities with respect to all Patents included in the Seller IP. No Selling Entity or Acquired Subsidiary has engaged in Patent or Copyright misuse or any fraud or inequitable conduct in connection with any Registered IP.

      (c)    The Selling Entities and the Acquired Subsidiaries own or possess valid rights to use all Seller IP and all Licensed Intellectual Property. There is no restriction or limitation on the right of the Selling Entities to transfer exclusive ownership of any Seller IP to the Buyer or a Buyer Designee pursuant to the Sale Order. No Person who has licensed Intellectual Property Rights or Technology to a Selling Entity or Acquired Subsidiary has ownership rights or license rights to derivative works or improvements made by a Selling Entity or Acquired Subsidiary related to such Intellectual Property Rights or Technology, or has any rights or options to acquire any such improvements or Intellectual Property Rights related thereto. No Current Employee, Former Employee nor any current or former independent contractor of any of the Selling Entities or Acquired Subsidiaries has any rights, title or interest in any Seller IP, other than, in each case, rights that would no longer attach following the entry of the Sale Order. The Seller IP and the Licensed Intellectual Property are all the Intellectual Property Rights and Technology used in, held for use in or necessary for the operation of the Business as it is conducted as of the date of this Agreement.

      (d)    None of the Selling Entities or Acquired Subsidiaries has infringed, misappropriated, used or disclosed without authorization or otherwise violated, or is infringing, misappropriating, using or disclosing without authorization or otherwise violating any Intellectual Property Right of any other Person (including, to the Knowledge of Seller, any Patents). None of the Selling Entities or Acquired Subsidiaries has received any written claim or written notice from any Person alleging infringement, misappropriation, use or disclosure

36

without authorization or any other violation of Intellectual Property Rights or challenging the validity, enforceability, use or ownership of the Selling Entities' or Acquired Subsidiaries' interest in Seller IP. To the Knowledge of the Seller, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Seller IP.

(e)     The Selling Entities and Acquired Subsidiaries have taken commercially reasonable steps in accordance with normal industry practice to protect and maintain the confidentiality and secrecy of any Selling Entity's or Acquired Subsidiary's Trade Secrets and any other confidential and proprietary information and materials, or any other confidential Seller IP.

(f)     The information technology systems of the Selling Entities and Acquired Subsidiaries, including material software, servers and hardware, are sufficient to operate the Business as it is currently conducted. All information technology systems of the Selling Entities and Acquired Subsidiaries are owned by, or licensed or leased to, the Selling Entities and Acquired Subsidiaries. Each Contract granting a license or lease to a Selling Entity or Acquired Subsidiary for such information technology systems is listed in Section 5.11(f) of the Seller Disclosure Schedule. The Selling Entities and Acquired Subsidiaries are the legal and beneficial owners of, or have a contractual right to use, the such information technology systems free from Encumbrances, except for Permitted Encumbrances, and have not, in the twelve (12) months prior to the date of this Agreement, received written notice from a third Person alleging that any Selling Entity or Acquired Subsidiary is in default under licenses or leases relating to the information technology systems. The Selling Entities and Acquired Subsidiaries have taken commercially reasonable security measures in accordance with normal industry practice to protect the information technology systems against intrusion. Since January 1, 2010, (i) the information technology systems of the Selling Entities and Acquired Subsidiaries have not suffered any material failure, and (ii) none of the Selling Entities or Acquired Subsidiaries has suffered any security breaches that have resulted in a third Person obtaining access to any material confidential or proprietary information of the Selling Entities or Acquired Subsidiaries or personal identifiable information of their customers. The Selling Entities and Acquired Subsidiaries are in material compliance with any posted privacy policies and any Laws relating to personal data or other information; and no such privacy policy requires the delivery of any notice to or consent from any Person, or prohibits the transfer of personal data or other information collected and in the possession or control of any Selling Entity or Acquired Subsidiary to the Buyer, in connection with the execution, delivery, or performance of this Agreement or the consummation of any of the transactions contemplated herein.

(g)     The Seller Entities and Acquired Subsidiaries implement industry standard measures designed to prevent the introduction of Malicious Code into information technology systems of the Selling Entities and Acquired Subsidiaries and into any product of any Selling Entity or Acquired Subsidiary, including firewall protections and regular virus scans. "Malicious Code" means any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other code designed or intended to have, or capable of performing or facilitating, any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) compromising

OC\1697932.15

the privacy or data security of a user or damaging or destroying any data or file without the user's consent.

(h)     No source code for any product of any Selling Entity or Acquired Subsidiary has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, a Current Employee or a contractor who is providing or has provided development services to a Selling Entity or Acquired Subsidiary. No Selling Entity or Acquired Subsidiary has any duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any product of any Selling Entity or Acquired Subsidiary to any escrow agent or other Person. No event has occurred, and to the Knowledge of the Seller, no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any source code for any product of any Selling Entity or Acquired Subsidiary to any other Person who is not a Current Employee.

(i)     No funding, facilities or personnel of any Government Authority or of any university, college, other educational institution or research center was used, directly or, to the Knowledge of Seller, indirectly, in the development of any Seller IP.

(j)     Schedule 5.11(j) of the Company Disclosure Letter contains a list and description of all standard-setting organizations, industry bodies and other standards-related activities in which any Selling Entity or Acquired Subsidiary has participated in or contributed to.

(k)     No product of any Selling Entity or Acquired Subsidiary is subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License, Lesser GNU Public License, or Mozilla Public License) that (i) could require, or could condition the use or distribution of such product or portion thereof on, (A) the disclosure, licensing, or distribution of any source code for any portion of such product, or (B) the granting to licensees of the right to make derivative works or other modifications to such products or portions thereof or (ii) could otherwise impose any limitation, restriction, or condition on the right or ability of any Selling Entity or Acquired Subsidiary to use, distribute or charge for any product of any Selling Entity or Acquired Subsidiary.

Section 5.12   Taxes.

(a)     All material Tax Returns (and, with respect to any Acquired Subsidiary, all Tax Returns) required to be filed by or with respect to any Selling Entity with respect to the Purchased Assets or any Acquired Subsidiary have been timely filed (taking into account any extension of time within which to file) and all such Tax Returns are true, correct, and complete in all material respects.

(b)     Except as set forth on Section 5.12(b) of the Seller Disclosure Schedule, all material Taxes (and, with respect to any Acquired Subsidiary, all Taxes) with respect to the Purchased Assets of the Selling Entities and the Acquired Subsidiaries have been timely paid.

OC\1697932.15

(c)    Except as set forth on <u>Section 5.12(c)</u> of the Seller Disclosure Schedule, no material deficiency for any amount of Taxes has been proposed, asserted or assessed in writing by any Governmental Authority against any Selling Entity with respect to the Purchased Assets or the Acquired Subsidiaries that remains unpaid.  There are no audits, examinations or other administrative or judicial Legal Proceedings currently ongoing or pending with respect to any Taxes with respect to the Purchased Assets of any Selling Entity or any Acquired Subsidiary. There are no waivers or extensions of any statute of limitations currently in effect with respect to Taxes of any Selling Entity with respect to the Purchased Assets or any Acquired Subsidiary, other than with respect to any currently open audits.

(d)    Except as set forth on <u>Section 5.12(d)</u> of the Seller Disclosure Schedule, all material Taxes required to be withheld or collected by the Selling Entities or the Acquired Subsidiaries have been withheld and collected and, to the extent required by Law, timely paid to the appropriate Governmental Authority.

(e)    There are no Encumbrances for Taxes upon any Purchased Assets or upon any property or assets of the Acquired Subsidiaries, except for Permitted Encumbrances.

(f)    No written claim has been received by a Selling Entity or an Acquired Subsidiary from an authority in a jurisdiction where any Acquired Subsidiary does not file Tax Returns claiming that such Acquired Subsidiary is or may be subject to taxation in that jurisdiction, which claim, if successfully asserted, could reasonably be expected to result in any material liability for Taxes.

(g)    The Selling Entities have delivered or made available to Buyer complete and accurate copies of all income and other material federal, state, local and foreign Tax Returns of the Acquired Subsidiaries for all taxable years remaining open under the applicable statute of limitations, including, promptly upon their availability, for the most recent taxable year, and complete and accurate copies of all audit or examination reports and statements of deficiencies assessed against or agreed to by the Acquired Subsidiaries since January 1, 2010.

(h)    No Acquired Subsidiary has been a member of an affiliated group filing a consolidated federal income Tax Return or any similar group for federal, state, local or foreign Tax purposes.  No Acquired Subsidiary has any liability for the Taxes of any other Person (i) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), (ii) as a transferee or successor, (iii) by Contract or (iv) otherwise.

(i)    No Acquired Subsidiary is, or has been, a party to or bound by any Tax indemnity agreement, Tax sharing agreement, Tax allocation agreement or similar Contract.

(j)    No entity classification election pursuant to Treasury Regulations Section 301.7701-3 has been filed with respect to any of the Acquired Subsidiaries.

(k)    No Acquired Subsidiary has been a party to a transaction that is or is substantially similar to a "reportable transaction," as such term is defined in Treasury Regulations Section 1.6011-4(b)(1), or any other transaction requiring disclosure under analogous provisions of state, local or foreign Tax law.

OC\1697932.15

(l)    No Acquired Subsidiary has engaged in a trade or business, had a permanent establishment (within the meaning of an applicable Tax treaty), or otherwise become subject to Tax jurisdiction in a country other than the country of its formation.

(m)    No Acquired Subsidiary (i) is or was a "surrogate foreign corporation" within the meaning of Section 7874(a)(2)(B) of the Code or is treated as a U.S. corporation under Section 7874(b) of the Code; or (ii) was created or organized in the United States such that such entity would be taxable in the United States as a domestic entity pursuant to United States Treasury Regulation Section 301.7701-5(a).

(n)    The prices and terms for the provision of any property or services by or to the Acquired Subsidiaries are arm's length for purposes of the relevant transfer pricing laws, and all related documentation required by such laws has been timely prepared or obtained and, if necessary, retained.

(o)    For the period commencing on the first day of any Straddle Period and ending at the close of business on the Closing Date, no Acquired Subsidiary has any item of income which could constitute subpart F income within the meaning of Section 952 of the Code. As of the Closing Date, no Acquired Subsidiary will hold assets that constitute U.S. property within the meaning of Section 956 of the Code.

(p)    The Seller has provided or made available to Buyer all documentation relating to, and the Acquired Subsidiaries are in full compliance with, all material applicable terms and conditions of, any Tax exemption, Tax holiday, Tax incentive or other Tax reduction agreement or order of a territorial or non-U.S. government. The consummation of the transactions contemplated by this Agreement will not have any adverse effect on the continued validity and effectiveness of any such Tax exemption, Tax holiday, Tax incentive or other Tax reduction agreement or order.

(q)    Since January 1, 2013, with respect to each Selling Entity and each Acquired Subsidiary, there has not been any new, change in or revocation of any Tax election; settlement or compromise of any claim, notice, audit report or assessment in respect of Taxes; change in any annual Tax accounting period, adoption or change in any method of Tax accounting; filing of any amended Tax Return; entrance into any tax allocation agreement, tax sharing agreement, tax indemnity agreement or closing agreement relating to any tax; surrender of any right to claim a material Tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any Tax claim or assessment.

(r)    The unpaid Taxes of each of the Acquired Subsidiaries did not, as of October 31, 2013, exceed the reserve for Tax liability (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the October Balance Sheet. Since October 31, 2013, none of the Acquired Subsidiaries has incurred any Liability for Taxes outside the ordinary course of business or otherwise inconsistent with past custom and practice.

Section 5.13    Insurance.    Section 5.13 of the Seller Disclosure Schedule sets forth a true and correct list of all insurance policies of the Selling Entities and the Acquired Subsidiaries or

covering the Purchased Assets, the Assumed Liabilities, the Business and the Current Employees. All such policies (i) are in full force and effect and all premiums thereon have been paid, and the Selling Entities are otherwise in compliance in all material respects with the terms and provisions of such policies, and (ii) provide insurance in such amounts and against such risks as is sufficient to comply with applicable Law. Neither the Selling Entities nor the Acquired Subsidiaries are in breach or default, and neither the Selling Entities nor the Acquired Subsidiaries have taken any action or failed to take any action which, with notice, the lapse of time or the happening of any other event or condition, would constitute such a breach or default, or permit termination or modification of, any of such insurance policies. To the Seller's Knowledge, there are no pending notices of cancellation or non-renewal of any insurance policy referred to in this Section 5.13 nor has the termination of any such insurance policy been threatened.

Section 5.14    Assets; Real Property.

(a)    The Selling Entities or the Acquired Subsidiaries, as applicable, have good and valid title to, or, in the case of leased assets have good and valid leasehold interests in, all tangible personal property included in the Purchased Assets, free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against such tangible personal property following the Closing in accordance with the Sale Order). Except for the assets that the Buyer elects not to acquire pursuant to Sections 2.2 and 2.6, the Purchased Assets constitute all of the assets, tangible and intangible, necessary for operation of the Business in the manner presently operated by the Selling Entities and in the manner proposed to be operated immediately following the Closing. Each tangible Purchased Asset has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used.

(b)    Each Selling Entity or Acquired Subsidiary, as applicable, has valid leasehold interests in the Real Property Leases and the real property leased by the Acquired Subsidiaries (such leasehold interests, the "Seller Properties"), in each case sufficient to conduct the Business as currently conducted and free and clear, as of the Closing, of all Encumbrances (other than Permitted Encumbrances and except to the extent that such Encumbrances will not be enforceable against the Owned Real Property or the Real Property Leases following the Closing in accordance with the Sale Order), assuming the timely discharge of all obligations owing under or related to the Seller Properties.

Section 5.15    Environmental Matters. (i) Each Selling Entity and Acquired Subsidiary is in compliance with all Laws relating to the protection of the environment, natural resources or to health and safety ("Environmental Laws"), (ii) each Selling Entity and Acquired Subsidiary has obtained and maintained all Permits issued pursuant to Environmental Laws that are required to conduct the Business as it is currently conducted, (iii) there has been no release of any waste, material or substance defined, characterized or otherwise classified as a "hazardous", "pollutant", "contaminant", "toxic" or words of similar meaning or effect, including petroleum and its by-products, asbestos or polychlorinated biphenyls under any applicable Environmental Law into the environment as a result of the operations or activities of any Selling Entity or Acquired Subsidiary, or any other Person, at any of the Seller Properties that would reasonably be

41

expected to result in any liability under any Environmental Law, and (iv) none of the Selling Entities or Acquired Subsidiaries has received any written claim or notice of violation from any Governmental Authority, and to the Knowledge of the Seller, no such claim or notice is pending or threatened, alleging that a Selling Entity or an Acquired Subsidiary is in violation of, or liable under, any Environmental Law that has not been remedied as of the date hereof.

Section 5.16    Permits. The Selling Entities and the Acquired Subsidiaries have obtained and possess all material Permits required by Law to be held by such Selling Entity or Acquired Subsidiary, as applicable, for the lawful conduct and operation of the Business as presently conducted and operated, or necessary for the lawful ownership of their properties and assets, a true and complete list of which is set forth in Section 5.16 of the Seller Disclosure Schedule. Each such Permit of the Selling Entities and the Acquired Subsidiaries is valid and in full force and effect, and the Selling Entities and the Acquired Subsidiaries are in material compliance with all such Permits.

Section 5.17    Inventory. The inventories of the Selling Entities and the Acquired Subsidiaries are in good and marketable condition, and are saleable in the ordinary course of business, other than for normal discounts in the ordinary course of business. The consolidated inventory of the Seller set forth in the Seller Financial Statements was stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act) and presents fairly, in all material respects, the consolidated inventory of the Seller as of the respective dates thereof (subject, in the case of unaudited financial statements, to normal period end adjustments). Reserves for markdowns, shortage, salvage, lower of cost or market, obsolete, excess, damaged or otherwise unsaleable and unusable inventory have been reflected in the Seller Financial Statements in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act).

Section 5.18    Accounts and Notes Receivable and Payable. All accounts and notes receivable of the Selling Entities and the Acquired Subsidiaries reflected in the Seller Financial Statements have arisen in the ordinary course of business. The consolidated accounts receivable of the Seller, net of any allowances for doubtful accounts, set forth in the Seller Financial Statements were stated therein in accordance with GAAP applied on a consistent basis throughout the periods indicated (except as may be indicated in the notes thereto and in the case of unaudited quarterly financial statements, as permitted by Form 10-Q under the Exchange Act) and presents fairly, in all material respects, the consolidated accounts receivable of the Seller as of the respective dates thereof (subject, in the case of unaudited financial statements, to normal period end adjustments). All accounts payable of the Selling Entities and the Acquired Subsidiaries reflected in the Seller Financial Statements have arisen in the ordinary course of business.

Section 5.19    Products. None of the Selling Entities or the Acquired Subsidiaries has, whether voluntarily or as a result of any action by any Governmental Authority or trade or consumer group, generally recalled or withdrawn (or been requested to recall or withdraw) a product, including any product sold by a licensee of any Selling Entity or any Acquired

42

Subsidiary which incorporates any Seller IP (other than products where the applicable licensee has acknowledged that it has an obligation to indemnify any applicable Selling Entities), for any reason, including any manufacturing or labeling defect or any other product safety issue, or issued any press release or public statements advising its customers or consumers of its products to treat such products in any manner other than in the ordinary course. No product of any Selling Entity or Acquired Subsidiary fails to materially comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such product.

Section 5.20    Foreign Corrupt Practices Act.  Neither any Selling Entity or any Acquired Subsidiary, nor, to the Knowledge of the Seller, any Representative, consultant or agent thereof acting on any Selling Entity's or Acquired Subsidiary's behalf, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to (a) any foreign official (as such term is defined in the Foreign Corrupt Practices Act of 1977, as amended (the "FCPA")) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof, or (b) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both (a) and (b) above in order to assist any Selling Entity or Acquired Subsidiary to obtain or retain business for or direct business to any Selling Entity or Acquired Subsidiary and under circumstances which could subject any Selling Entity or Acquired Subsidiary to liability under the FCPA or any corresponding foreign Laws or any anti-corruption Laws in any country in which any Selling Entity or any Acquired Subsidiary operates or conducts business.

Section 5.21    Banks.    Section 5.21 of the Seller Disclosure Schedule contains a complete and correct list of the names and locations of all banks in which any Selling Entity or Acquired Subsidiary has accounts or safe deposit boxes and the names of all persons authorized to draw thereon or to have access thereto.  Except as set forth in Section 5.21 of the Seller Disclosure Schedule, no Person holds a power of attorney to act on behalf of any Selling Entity or Acquired Subsidiary with respect to any such accounts or safe deposit boxes.

Section 5.22    Brokers.  Except as set forth in Section 5.22 of the Seller Disclosure Schedule, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by any Selling Entity or Acquired Subsidiary in connection with the transactions contemplated by this Agreement.  Such fees shall be paid in full by the Seller.

Section 5.23    No Other Agreements to Sell the Acquired Assets.  No Selling Entity has any legal obligation, absolute or contingent, to any other Person to sell the Purchased Assets (other than a sale or disposition of Inventory in the ordinary course of business), the Assumed Liabilities or any portion thereof or to sell any portion of the Business or to effect any merger, consolidation or other reorganization relating to the Purchased Assets or the Business or to enter into any agreement with respect thereto, except pursuant to this Agreement.

43

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer hereby represents and warrants to the Selling Entities as of the date hereof and as of the Closing Date as follows:

Section 6.1    <u>Organization and Good Standing</u>.    The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of Japan. Any Buyer Designee that executes and delivers any Transaction Document will be a corporation or other entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization as of the Closing Date.

Section 6.2    <u>Authority Relative to this Agreement</u>.

(a)    The Buyer has all necessary power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which the Buyer is party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all corporate action on behalf of the Buyer, and no other corporate proceedings on the part of the Buyer are necessary to authorize the execution, delivery and performance by Buyer of this Agreement or the other Transaction Documents to which it is party or to consummate the transactions contemplated hereby or thereby.  This Agreement has been duly and validly executed and delivered by the Buyer, and, upon their execution and delivery in accordance with the terms of this Agreement, each of the other Transaction Documents to which the Buyer is a party will have been duly and validly executed and delivered by the Buyer, and, assuming that this Agreement and such other Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, constitute valid and binding agreements of the Buyer, enforceable against the Buyer in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

(b)    Each Buyer Designee that executes and delivers a Transaction Document shall have, as of the Closing Date, all necessary corporate or other power and authority to execute, deliver and perform the Transaction Documents to which it is party and to consummate the transactions contemplated thereby. The execution, delivery and performance by each Buyer Designee of each Transaction Documents to which such Buyer Designee is party and the consummation of the transactions contemplated thereby shall have been duly and validly authorized by all corporate or other requisite action on behalf of each Buyer Designee that executes and delivers a Transaction Document prior to such execution and delivery, and no other corporate or other organizational proceedings on the part of such Buyer Designee shall be necessary at the time of such execution and delivery to authorize the execution, delivery and performance by such Buyer Designee of the Transaction Documents to which it is party or to consummate the transactions contemplated thereby. The Transaction Documents to which a Buyer Designee is party shall have been duly and validly executed and delivered prior to the Closing by each Buyer Designee that executes and delivers a Transaction Document, and,

assuming that the Transaction Documents constitute valid and binding agreements of the Selling Entities party thereto, shall constitute valid and binding agreements of such Buyer Designee, enforceable against such Buyer Designee in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other Laws of general application affecting enforcement of creditors' rights and (ii) general principles of equity.

Section 6.3    No Violation; Consents.

(a)    Neither the execution and delivery of this Agreement by the Buyer, nor the purchase by the Buyer and/or any applicable Buyer Designees of the Purchased Assets and the assumption by the Buyer and/or such Buyer Designees of the Assumed Liabilities pursuant to this Agreement or the other Transaction Documents will (with or without notice or lapse of time) violate, conflict with or result in any breach of, (i) any provision of the Buyer's or any such Buyer Designee's certificate of incorporation or bylaws (or similar organizational documents) or (ii) subject to the matters referred to in Section 6.3(b), any Law applicable to Buyer or any such Buyer Designee or their respective properties or assets.

(b)    No Consent of any Governmental Authority or any third party is required to be obtained by or with respect to Buyer and/or any applicable Buyer Designee in connection with the execution, delivery and performance of this Agreement or any other Transaction Document to which Buyer or any Buyer Designee is a party, or the consummation by Buyer or such Buyer Designee of the transactions contemplated hereby and thereby, except for (i) compliance with any applicable requirements of Antitrust Laws, (ii) compliance with any applicable requirements of applicable securities Laws, (iii) the entry of the Sale Order by the Bankruptcy Court, and (iv) such other Consents where the failure to obtain such Consents would not prevent or delay the consummation of the transactions contemplated by this Agreement.

Section 6.4    Legal Proceedings and Orders.  There is no material Legal Proceeding pending before any Governmental Authority, and no Person has threatened in writing to commence any such material Legal Proceeding that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement, except for the Bankruptcy Case.  As of the date of this Agreement, there is no material outstanding Order to which the Buyer is subject that would reasonably be expected to have the effect of preventing or making illegal any of the transactions contemplated by this Agreement.

Section 6.5    Brokers.  No Person other than KPMG Corporate Finance LLC is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Buyer, any Buyer Designee or any of their respective Affiliates in connection with the transactions contemplated by this Agreement.

## ARTICLE VII
## COVENANTS OF THE PARTIES

Section 7.1    Conduct of Business of the Selling Entities.  Except (i) as set forth on Schedule 7.1, (ii) as required by the terms of this Agreement, or (iii) as otherwise consented to in writing by the Buyer in its sole discretion (which consent shall not be unreasonably withheld or

45

delayed), during the period commencing on the date of this Agreement and continuing through the Closing or the earlier termination of this Agreement in accordance with its terms:

(a)    each of the Selling Entities shall, and shall cause the Acquired Subsidiaries to: (i) operate the Business in the ordinary course of business, including making capital, supply and sales and marketing expenditures, each in the ordinary course of business and in accordance with any budget set forth in the Buyer DIP Facility, (ii) use commercially reasonable efforts to preserve in all material respects the Purchased Assets (excluding sales of Inventory in the ordinary course of business), and (iii) use commercially reasonable efforts to preserve its current relationships with the suppliers, vendors, customers, clients, contractors and others having business dealings with the Business; and

(b)    without limiting the generality of Section 7.1(a), and in addition thereto, the Selling Entities shall not, and shall cause the Acquired Subsidiaries not to:

(i)    take, or agree to or commit to take, any action which would (A) reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) be reasonably likely to result in any of the conditions to the Closing set forth in ARTICLE VIII not being satisfied, or (C) materially impair the ability of any Selling Entity or Buyer to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(ii)    sell, lease (as lessor), transfer or otherwise dispose of, or permit to become subject to any additional Encumbrance (other than (A) Permitted Encumbrances, (B) Encumbrances arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), (C) Encumbrances arising in connection with the Buyer DIP Facility that will be released at or prior to Closing, and (D) Encumbrances that will not be enforceable against or attach to any Purchased Asset following the Closing in accordance with the Sale Order) any Purchased Assets, other than (x) the sale of Inventory or the disposition of obsolete equipment, in each case in the ordinary course of business, (y) the collection of receivables in the ordinary course of business, and (z) the use of prepaid assets and Documentary Materials in the conduct of the Business in the ordinary course of business;

(iii)    make any payments in respect of Indebtedness other than payments due pursuant to the terms thereof;

(iv)    conduct any liquidation or similar sales;

(v)    hire or terminate any employee, consultant or director, establish or increase, or commit to establish or increase, the compensation payable or benefits provided to any director or consultant of any Selling Entity or any of their Affiliates or to any Current Employee, pay or grant, as applicable, any equity or equity-linked award, cash bonus, performance or other incentive compensation, or make any profit sharing, severance, termination or similar payment to any consultant or director of any Selling Entity or any of their Affiliates or any Current Employee, accelerate the vesting or payment of any compensation or benefits under any Seller Benefit Plan, or establish,

46

adopt, enter into, modify, amend or terminate any Seller Benefit Plan, other than (A) as required by the terms of any Contract or Seller Benefit Plan in effect on the date of this Agreement, (B) as provided in any incentive or retention program or similar arrangement approved by Final Order, (C) any termination of, or reduction in benefits payable under, a Seller Benefit Plan prior to the Closing, or (D) in the case of the termination of any employee or consultant for cause in accordance with the normal practices of the applicable Selling Entity;

(vi)     incur or assume any Indebtedness other than in the ordinary course of business, or that will be repaid or released on or prior to the Closing;

(vii)     with respect to the Acquired Subsidiaries, make or rescind any election relating to Taxes, settle or compromise any claim, action, suit, litigation, Legal Proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax Returns;

(viii)     acquire any assets or properties outside the ordinary course of business, or make any other investment;

(ix)     enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(x)     except in the ordinary course of business, cancel or compromise any debt or claim or waive or release any right, in each case, that is a debt, claim or right of the Acquired Subsidiaries or that is a Purchased Asset or Assumed Liability;

(xi)     introduce any material change with respect to the operation of the Business, including any change in the types, nature, composition or quality of products or services sold in the Business, other than, in each case, in the ordinary course of business;

(xii)     enter into any new Material Contract;

(xiii)     abandon or knowingly permit to lapse any Registered IP;

(xiv)     enter into any Contract under which any Selling Entity or Acquired Subsidiary grants or agrees to grant to any third Person any assignment, license, release, immunity or other right with respect to any Seller IP (other than non-exclusive licenses of Seller IP granted to customers in the ordinary course of business);

(xv)     terminate, amend, restate, supplement, extend, renew or waive any rights under, or create any Encumbrance with respect to, or otherwise modify, any Assumed Agreement, any Assumed Real Property Lease or any Permit, or increase any payments required to be paid thereunder by the Buyer or any Buyer Designee after the Closing;

(xvi)    amend the certificate of incorporation or by-laws or other organizational documents of the Acquired Subsidiaries;

(xvii)    settle, or agree to settle, any claims, actions, or Legal Proceedings of the Acquired Subsidiaries or that is a Purchased Asset or Assumed Liability before any court or other Governmental Authority;

(xviii)    abandon any rights under, request the rejection under Section 365 of the Bankruptcy Code of, or amend, modify or supplement the terms of, any of the Assumed Agreements or Assumed Real Property Leases, or of any other Contracts that may become Assumed Agreements or Assumed Real Property Leases; or

(xix)    authorize any of the foregoing, or commit or agree to do any of the foregoing.

(c)    In furtherance of the foregoing, the Selling Entities agree to use commercially reasonable efforts to ensure that the Inventory (and the works-in-process relating to such Inventory) is manufactured and delivered such that management's current forecasted Inventory levels are achieved (including with respect to timing of deliveries of Inventory and works-in-process). In furtherance of the foregoing, the Selling Entities shall use commercially reasonable efforts to order, procure and accept Inventory after the date hereof to achieve the projected Inventory levels.

(d)    Seller shall use its reasonable best efforts to deliver to Buyer, at or prior to the Closing, a confirmation of assignment of Intellectual Property Rights from each of Disk Emulation Systems and Pullela Consulting Inc., each in a form reasonably acceptable to Buyer.

(e)    Commencing on the date of this Agreement, Seller, at its sole cost and expense, shall (i) conduct a technology audit of its use of Software and other Technology developed by OCZ Israel, Ltd. that is subject to any grant conditions imposed by OCS, (ii) issue a written report to Buyer within thirty (30) days from the date of this Agreement, detailing the use of such Software and other Technology, and (iii) provide a complete list of all products in which such Software or other Technology is used and for which royalties are payable to OCS. In addition, at Buyer's request following the technology audit, Seller shall cooperate with Buyer to seek confirmation of such findings from OCS and further, if Buyer so requests, cooperate with Buyer to seek a determination from OCS regarding such Software and other Technology to close the relevant OCS files due to technological or marketing failure.

Section 7.2    <u>Access to and Delivery of Information; Maintenance of Records</u>.

(a)    Between the date of this Agreement and the Closing Date, to the extent permitted by applicable Law, the Selling Entities shall and shall cause the Acquired Subsidiaries to, during ordinary business hours and upon reasonable prior notice (i) give the Buyer and the Buyer's Representatives reasonable access to the Selling Entities and Acquired Subsidiaries' Representatives in their respective principal places of business, all books, records and other documents and data in the locations in which they are normally maintained, and all offices and other facilities of the Selling Entities and the Acquired Subsidiaries, (ii) permit the Buyer and the Buyer's Representatives to make such reasonable inspections and copies of all books, records

48

and other documents of the Selling Entities and the Acquired Subsidiaries to the extent relating to the Purchased Assets as the Buyer may reasonably request, and (iii) furnish the Buyer with such reasonably available financial and operating data and other information in connection with the Purchased Assets as the Buyer and the Buyer's Representatives may from time to time reasonably request.

(b)    On and after the Closing Date, the Buyer and the Buyer's Representatives shall have reasonable access to the Selling Entities' and to the Acquired Subsidiaries' books and records, including all information pertaining to the Assumed Agreements and Assumed Real Property Leases, in the possession of the Selling Entities or the Acquired Subsidiaries to the extent that (i) such books, records and information relate to any period prior to the Closing Date and are not already in the possession of the Buyer or the Buyer's Representatives and (ii) such access is reasonably required by the Buyer in connection with the Assumed Liabilities, the operation of the Business following the Closing or the Purchased Assets. Such access shall be afforded by the Seller upon receipt of reasonable advance notice and during normal business hours. If any of the Selling Entities shall desire to dispose of any books and records constituting Excluded Assets, the Seller shall (x) give the Buyer at least ninety (90) days prior written notice of such disposition and (y) give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such books and records as the Buyer may select and/or to copy at Buyer's sole cost and expense such books and records as the Buyer may select.

(c)    On and after the Closing Date, the Selling Entities and the Seller's Representatives shall have reasonable access to all of the books and records of the Selling Entities and the Acquired Subsidiaries delivered to the Buyer or any Buyer Designee at Closing or pursuant to Section 7.2(b) above, including all Documentary Materials and all other information pertaining to the Assumed Agreements and Assumed Real Property Leases to the extent that (i) such books, records and information relate to any period prior to the Closing Date and (ii) such access is reasonably required by the Selling Entities in connection with the Bankruptcy Case, the Excluded Liabilities, the Excluded Assets or similar matters relating to or affected by the operation of the Business for periods prior to the Closing. Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours, and the Buyer shall permit the Selling Entities and the Seller's Representatives to make such reasonable copies of such books, records and information as they may reasonably request at the Seller's sole cost and expense.

(d)    All information obtained pursuant to Section 7.2 shall be subject to the terms of the Confidentiality Agreement. In addition, from and after the Closing and except as required by Law, the Selling Entities shall, and shall cause their Affiliates and Representatives to, (i) treat and hold as confidential any information to the extent concerning the Purchased Assets or the Assumed Liabilities that is not, as of the Closing, generally available to the public (the "Confidential Information") and (ii) refrain from using any of the Confidential Information for commercial purposes; provided, however, that "Confidential Information" shall not include (i) any information that becomes publicly available after the Closing Date through no fault of any Selling Entity or any of their respective Affiliates and Representatives, or (ii) any information that after the Closing Date is legitimately received by any Selling Entity or any of its Affiliates or Representatives from a third Person (provided that such third Person is not known by any Selling Entity or any of their Affiliates to be bound by an obligation of secrecy with

respect to such information).  Each Selling Entity agrees that in the event it (or any of its Affiliates or Representatives) is required by Law to use or disclose any Confidential Information, such Selling Entity shall inform the Buyer in advance of any such required disclosure, shall use commercially reasonable efforts to cooperate with the Buyer in obtaining a protective order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such Law.

Section 7.3    Expenses.

(a)    The Seller shall, without the requirement of any notice or demand from Buyer or any application to or order of the Bankruptcy Court, pay the Buyer Expense Reimbursement in cash to the Buyer on the earlier to occur of (i) two Business Days after the date this Agreement is terminated by the Buyer pursuant to Section 9.1 other than pursuant to Section 9.1(a), or (ii) on the date this Agreement is terminated by the Seller pursuant to Section 9.1 other than pursuant to Sections 9.1(a) or 9.1(c).

(b)    Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such fees, costs and expenses.

(c)    Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall find and determine that the claim of the Buyer in respect of the Buyer Expense Reimbursement is and constitutes an allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility).

Section 7.4    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with its terms, each of the Parties shall use its commercially reasonable efforts, to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement, including executing and delivering such documents and other papers as are reasonably required to carry out the provisions of this Agreement and consummate the transaction contemplated hereby.

(b)    On and after the Closing, the Selling Entities and the Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in the Buyer all of the Selling Entities' right, title and interest to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(c)     Nothing in <u>Section 7.4</u> shall, except as otherwise set forth in this Agreement, (i) prohibit any Selling Entity from ceasing operations or winding up its affairs following the Closing, or (ii) prohibit the Selling Entities from taking such actions as are necessary to conduct the Auction, as are required by the Bankruptcy Court, or as would otherwise be permitted under <u>Section 7.1</u>.

Section 7.5     <u>Public Statements</u>.  The text of the initial press release or press releases relating to this Agreement (which may be joint or separate) shall be agreed to by the Buyer, on the one hand, and the Seller, on the other hand.  Unless otherwise required by applicable Law or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, the Buyer, on the one hand, and the Selling Entities, on the other hand, shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Seller or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed).

Section 7.6     <u>Governmental Authority Approvals and Cooperation</u>.

(a)     As promptly as reasonably practicable after the date of this Agreement each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) make any filings and notifications required to be made by them (which, in any event, shall be made within ten (10) days after the date of this Agreement), and shall use its commercially reasonable efforts to obtain any Consents from Governmental Authorities, required to be made and obtained under applicable Law in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable after the date of this Agreement.

(b)     Each of the Buyer and the Seller shall use commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect to the transactions contemplated by this Agreement under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended and any other applicable United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws").  Each of the Buyer and the Seller shall use commercially reasonable efforts to take such action as may be reasonably required to cause the expiration of any applicable notice periods under the Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement.  Notwithstanding anything to the contrary provided herein, none of Buyer nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, including any of the Purchased Assets, or to enter into any consent decree or settlement agreement with any Governmental Authority, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the applicable conditions to this Agreement set forth in ARTICLE VIII.

(c)     Each Party (i) shall cooperate with each other Party in connection with the filings and Consents contemplated by this <u>Section 7.6</u>, (ii) shall promptly inform each other Party of any material communication received by such Party from any Governmental Authority

51

concerning this Agreement, the transactions contemplated hereby and any filing, notification or request for Consent related thereto, and (iii) shall permit each other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto.  In addition, none of the Selling Entities or the Buyer shall (and shall ensure that their respective Affiliates do not) agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto unless it consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority and applicable Law, gives the other Parties the opportunity to attend and participate thereat.  The Selling Entities and the Buyer shall, and shall cause their respective Affiliates to, furnish the Buyer or the Selling Entities (and the Buyer's Representatives and the Seller's Representatives, as applicable), as the case may be, copies of all material correspondence, filings and communications between it and its Affiliates (and the Buyer's Representatives and the Seller's Representatives, as applicable) on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby or any such filing, notification or request for Consent related thereto.  Each of the Selling Entities and the Buyer shall (and shall cause their respective Affiliates to) furnish each other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with its preparation of necessary filings, registrations or submissions of information to any Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for Consent related thereto.

Section 7.7   Employee Matters.

(a)   Prior to the Closing, the Buyer shall offer, or cause a Buyer Designee to offer, to employ all or substantially all Business Employees (other than any employees of the Acquired Subsidiaries who continue to be employed by the Acquired Subsidiaries following the Closing (the "Non-US Transferred Employees")) with employment commencing as of, and contingent on, the Closing, which offer of employment shall be on terms and conditions that are substantially similar, in the aggregate, to the terms and conditions of employment with the applicable Selling Entity immediately prior to the Closing Date, excluding any equity-based compensation and severance benefits.  Any such offers of employment shall be subject to satisfaction of Buyer's standard employment qualifications, including verification of eligibility for employment.  For purposes of this Agreement, each Business Employee who receives such an offer of employment shall be referred to as an "Offeree."  At least five (5) Business Days prior to the Closing Date, the Buyer will provide the Seller with a schedule setting forth a list of the names of all Offerees.  The Selling Entities shall terminate the employment of all Offerees who accept an offer of employment prior to the Closing and commence employment with the Buyer or a Buyer Designee, as well as their participation in or under any Seller Benefit Plans, effective immediately prior to the Closing.  With regard to Non-US Transferred Employees, subject to applicable Law, Buyer or Buyer Designee shall (i) assume and adopt the Seller Benefits Plans that such Non-US Transferred Employees participate in immediately prior to the Closing Date, but excluding equity compensation, or (ii) provide such Non-US Transferred Employees terms and conditions of employment that are substantially similar, in the aggregate, to the terms and conditions of employment with the applicable Selling Entity immediately prior to the Closing Date, excluding any equity-based compensation and severance benefits, as

52

determined by the Buyer in its sole discretion. Each Offeree who accepts such offer prior to the Closing and commences employment with the Buyer or a Buyer Designee, collectively with Non-US Transferred Employees, shall be referred to herein as a "Transferred Employee". Buyer covenants and agrees that each Transferred Employee shall be eligible to participate in Buyer's severance plan on the terms and conditions provided to similarly-situated employees of Buyer or Buyer Designee and shall be eligible to receive credit for any unpaid vacation and paid time off he or she has accrued with the applicable Selling Entity as of the Closing Date, under Buyer's vacation policy; *provided, however*, that Non-US Transferred Employees in the United Kingdom shall participate in a severance plan and vacation policy that is no less favorable than the terms applicable to such employee prior to the Closing Date.

(b)    Each Current Employee who is not a Transferred Employee shall be referred to herein as an "Excluded Employee."

(c)    Following the date of this Agreement,

(i)    the Selling Entities shall allow the Buyer or any applicable Buyer Designee reasonable access to meet with and interview the Current Employees who are members of executive management and other employees reasonably requested during normal business hours; *provided, however*, that such access shall not unduly interfere with the operation of the Business prior to the Closing;

(ii)    the Selling Entities shall not, nor shall any Selling Entity authorize or direct or give express permission to any Affiliate, officer, director, or employee of any Selling Entity or any Affiliate to (A) interfere with Buyer's or any Buyer Designee's rights under Section 7.7(a) to make offers of employment to any Offeree, or (B) solicit or encourage any Offeree not to accept, or to reject, any such offer of employment; and

(iii)    the Selling Entities shall provide reasonable cooperation and information to Buyer or the relevant Buyer Designee as reasonably requested by Buyer or such Buyer Designee with respect to its determination of appropriate terms and conditions of employment for any Offeree.

(d)    401(k) Plan. To the extent that any Transferred Employees participate in one or more Seller Benefit Plans that are intended to qualify under Section 401(k) of the Code, Seller and its Subsidiaries shall cause the unvested account balances (if any) of each such Transferred Employee under each such plan to vest in full upon or prior to the Closing.

(e)    The Selling Entities shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Current Employees as a result of any action by the Selling Entities on or prior to the Closing, or following the Closing with respect to any Current Employee who does not become a Transferred Employee for any reason.

(f)    Prior to and effective as of the Closing, Buyer or one or more Buyer Designees shall adopt the Buyer Retention Plan.

(g)     From and after the date of this Agreement, prior to making any written or formal oral communications to employees, officers or consultants of the Selling Entities and their Affiliates pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, the Seller shall provide the Buyer with a copy of the intended communication prior to any distribution thereof, the Buyer shall have a reasonable period of time to review and comment on the communication, and the Buyer and the Selling Entities shall have mutually agreed on such communication and shall cooperate in distributing any such mutually agreeable communication to such employees, officers or consultants.

(h)     The provisions of this Section 7.7 are solely for the benefit of the respective parties to this Agreement and nothing in this Section 7.7, express or implied, shall confer upon any employee, consultant, manager or other service provider (or any dependent, successor, legal representative or beneficiary thereof), any rights or remedies, including any right to continuance of employment or any other service relationship with Buyer or any of its Affiliates, or any right to compensation or benefits of any nature or kind whatsoever under this Agreement. Nothing in this Section 7.7, express or implied, shall be: (i) an amendment or deemed amendment of any plan providing benefits to any employee, (ii) construed to interfere with the right of Buyer or its Affiliates to terminate the employment or other service relationship of any Transferred Employee at any time, with or without cause, or restrict any such entity in the exercise of their independent business judgment in modifying any of the terms and conditions of the employment or other service arrangement of any Transferred Employee, or (iii) deemed to obligate Buyer or its Affiliates to adopt, enter into or maintain any employee benefit plan or other compensatory plan, program or arrangement at any time.

Section 7.8     Tax Matters.

(a)     Any sales, use, value added, property transfer, documentary, stamp, registration, recording or similar Tax payable in connection with the sale or transfer of the Purchased Assets and the assumption of the Assumed Liabilities and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code ("Transfer Taxes") shall be borne by the Selling Entities. The Selling Entities and Buyer shall use their commercially reasonable efforts and cooperate in good faith to (i) exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes and (ii) relieve Buyer and its Affiliates of any Liability for Transfer Taxes, Taxes of the Selling Entities and Taxes of the Acquired Subsidiaries for any Pre-Closing Tax Period, including by following any procedures with a Governmental Authority that may be legally available in non-U.S. jurisdictions to protect the Buyer from successor or transferee Liability for Taxes (including obtaining the Government Uniform Invoice Certificate evidencing payment of all applicable value added Taxes in Taiwan). Seller shall prepare and file (or cause to be prepared and filed) all necessary Tax Returns with respect to all Transfer Taxes and provide copies of such Tax Returns to Buyer at least five (5) Business Days prior to the date such returns are due for Buyer's review and consent, not to be unreasonably withheld, provided, however, that Buyer may elect to prepare and file such Tax Returns. If Buyer so elects, Buyer shall prepare and may file (or cause to be prepared and filed) such Tax Returns. In such case, Buyer shall provide copies of such Tax Returns to the Seller at least five (5) Business Days prior to the date such returns are due (or as soon thereafter as reasonably practicable), and shall incorporate all reasonable comments of the Seller to such Tax Returns which the Seller provides to the Buyer reasonably in advance of the time such Tax Returns are due. The Selling Entities

54

shall cooperate with the Buyer to give effect to any such election by the Buyer, including by executing such documents as may be required to permit Buyer to file such Tax Returns on behalf of the parties or the Selling Entities.   Notwithstanding anything to the contrary in this Agreement, Buyer may, in its sole discretion, elect to pay, or cause to be paid, any Transfer Taxes in part or in full (in which case either the Purchase Price shall be reduced by such amount of Transfer Taxes or a portion of the Purchase Price in the amount of such Transfer Taxes shall be withheld from the Purchase Price but considered to be paid to Seller) and the amount of such reduction or withholding shall be paid to the applicable Governmental Authority in respect of such Transfer Tax.   For the avoidance of doubt, this <u>Section 7.8(a)</u> shall not be construed to constitute the assumption by Buyer of any Liability for Transfer Taxes.

(b)     The Selling Entities shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period.   All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Selling Entities based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.   The Selling Entities shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and the Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.   Upon receipt of any bill for such Property Taxes, the Buyer or the Seller, as applicable, shall present a statement to the other setting forth the amount of reimbursement to which each is entitled under this <u>Section 7.8</u> together with such supporting evidence as is reasonably necessary to calculate the proration amount.   The proration amount shall be paid by the party owing it to the other within ten (10) Business Days after delivery of such statement.   In the event that the Buyer or the Seller makes any payment for which it is entitled to reimbursement under this <u>Section 7.8(b)</u>, the applicable party shall make such reimbursement promptly but in no event later than ten (10) Business Days after the presentation of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.   Any such Claims of the Buyer against the Selling Entities pursuant to this <u>Section 7.8(b)</u> shall constitute allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility).

(c)     The Buyer and the Seller agree to furnish or cause to be furnished to the other, upon request such information and assistance as is reasonably necessary for the filing of Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or Legal Proceeding relating to any Tax.   Such information and assistance shall include providing reasonable access to all of the books and records of the Selling Entities and the Acquired Subsidiaries delivered to the Buyer at Closing.

Section 7.9     <u>Submission for Bankruptcy Court Approval</u>

(a)     Each of the Selling Entities shall file the Petitions no later than the close of business on the first (1st) Business Day following the date of this Agreement.   On the Petition

Date, the Selling Entities shall file the Bidding Procedures and Sale Motion, in form and substance acceptable to the Buyer in its sole discretion, seeking the entry of the Bidding Procedures Order and of the Sale Order. All of the Parties shall use their respective commercially reasonable efforts to have (i) the Bankruptcy Court enter the Bidding Procedures Order by no later than twenty (20) days after the Petition Date, (ii) the Auction shall commence at least two (2) Business Days prior to the Sale Hearing, (iii) the Bankruptcy Court enter the Sale Order by no later than fifty (50) days after the Petition Date, and (iv) the Closing Date occur by no later than sixty five (65) days after the Petition Date. The Selling Entities shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures and Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Assets, and all non-debtor parties to the Assumed Agreements and the Assumed Real Property Leases, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedures and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Legal Proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. The Selling Entities shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be in form and substance acceptable to the Buyer in its sole discretion and submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review and comment.

(b)    A list of the Assumed Agreements and Assumed Real Property Leases shall be filed as an exhibit to the Bidding Procedures and Sale Motion (or, if required by the Bankruptcy Court, a motion to assume and assign the Assumed Agreements and the Assumed Real Property Leases), and shall be described in sufficient detail to provide adequate notice to the non-debtor parties to such Contracts. Upon designation or removal by the Buyer of the Assumed Agreements and the Assumed Real Property Leases in accordance with Section 2.6, the Seller shall promptly add any Assumed Agreements or Assumed Real Property Leases, respectively, to such exhibit to the Bidding Procedures and Sale Motion or promptly remove any Assumed Agreements or Assumed Real Property Leases from such exhibit, as applicable. Such exhibit shall set forth the applicable Cure Payment, if any, for each Assumed Agreement and each Assumed Real Property Lease as reasonably determined in good faith by the Seller.

(c)    Each Selling Entity and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Order. Each Selling Entity shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Selling Entity has in its possession (or receives) pertaining to the Bidding Procedures and Sale Motion, the Bidding Procedures Order, the Sale Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its counsel.

(d)    If the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be

OC\1697932.15

appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, the Selling Entities and the Buyer shall use their commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)     The Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers prepared by any Selling Entity (including forms of orders and notices to interested parties) in connection with transactions contemplated by this Agreement prior to their filing with the Bankruptcy Court.

Section 7.10    Overbid Procedures; Adequate Assurance.

(a)     The Selling Entities and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and the Selling Entities acknowledge that the Selling Entities must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of the Selling Entities and other interested parties, providing information about the Selling Entities' business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction (the "Auction").

(b)     The bidding procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. Buyer acknowledges that the Selling Entities and their Affiliates and the Seller's Representatives are and may continue soliciting inquiries, proposals or offers for the Purchased Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

(c)     Prior to the Sale Hearing, Buyer or the applicable Buyer Designee shall provide adequate assurance of future performance as required under Section 365 of the Bankruptcy Code for the Assumed Agreements and Assumed Real Property Leases. Buyer agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Agreements and the Assumed Real Property Leases, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court.

(d)     The Selling Entities and the Buyer agree, and the motion to approve the Bidding Procedures Order shall reflect the fact that, the provisions of this Agreement, including Section 7.3, this Section 7.10 and Section 7.11, are reasonable, were a material inducement to the Buyer, and reasonably relied upon by the Buyer in deciding, to enter into this Agreement, and are designed to achieve the highest or otherwise best price for the Purchased Assets.

OC\1697932.15

Section 7.11    <u>Termination Fee</u>.

(a)    If (x) this Agreement is terminated for any reason pursuant to <u>Sections 9.1(d)(i)</u> through <u>(d)(iv)</u> and (y) any Selling Entity consummates an Alternative Transaction at any time, then such Selling Entity shall, without the requirement of any notice or demand from Buyer or any application to or order of the Bankruptcy Court, immediately pay to the Buyer the Termination Fee in cash on the day such Alternative Transaction is consummated.

(b)    The Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer.

(c)    Pursuant to the Bidding Procedures Order, the Bankruptcy Court shall find and determine that the claim of the Buyer in respect of the Termination Fee is and constitutes an allowed super-priority administrative expense claim against the Selling Entities on a joint and several basis under Sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case, senior to all other administrative expense claims of the Selling Entities (other than any claims arising under the Buyer DIP Facility).

(d)    Each of the Parties hereto acknowledges and agrees that the agreements contained in <u>Section 7.3</u> and this <u>Section 7.11</u> are an integral part of the transactions contemplated by this Agreement and that the Termination Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate the Buyer in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone by the Buyer while negotiating and pursuing the transactions contemplated by this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

Section 7.12    <u>Transfer of Purchased Assets</u>.    The Buyer will make all necessary arrangements for the Buyer or a Buyer Designee to take possession of the Purchased Assets, and, at the Buyer's expense, to transfer same to a location operated by the Buyer or a Buyer Designee, to the extent necessary, as promptly as practicable following the Closing.

Section 7.13    <u>Post-Closing Operation of the Seller; Name Changes</u>.    The Seller hereby acknowledges and agrees that upon the consummation of the transactions contemplated hereby, the Buyer and/or each Buyer Designee shall have the sole right to the use of the name "OCZ" or similar names or any service marks, trademarks, trade names, identifying symbols, logos, emblems or signs containing or comprising the foregoing, including any name or mark confusingly similar thereto. After the Closing Date, none of the Selling Entities nor any of their respective Affiliates shall use the name or mark "OCZ" or any derivatives thereof for commercial purposes and shall only use the same for administrative purposes while subject to the jurisdiction of the Bankruptcy Court. The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the name of Seller, except that during the pendency of such proceedings, Seller shall be permitted to use the name "OCZ" as its corporate name in connection with matters relating to the Bankruptcy Case and as a former name for legal and noticing purposes, but for no other commercial purpose. After the Closing, the Selling Entities and their Affiliates shall promptly file with the applicable

OC\1697932.15

Governmental Authorities all documents reasonably necessary to delete from their names the words "OCZ" or any derivatives thereof and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

Section 7.14    Non-Competition; Non-Solicitation.

(a)    For a period from the Closing until the fifth (5th) anniversary of the Closing Date, each Selling Entity shall not directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of any business, whether in corporate, proprietorship or partnership form or otherwise, engaged in the Business or that otherwise competes with the Business (a "Restricted Business"). The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that the Buyer, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage or posting any bond whatsoever.

(b)    For a period from the Closing to the fifth (5th) anniversary of the Closing Date, each Selling Entity shall not: (i) cause, solicit, induce or encourage any Current Employees of any Selling Entity or Acquired Subsidiaries who are or become employees of the Buyer or a Buyer Designee to leave such employment or (ii) cause, induce or encourage any material actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former customer of a Selling Entity or Acquired Subsidiaries and any Person that becomes a client or customer of the Business after the Closing) or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship with the Buyer (but taking into account, in each case, the fact that the Bankruptcy Case have commenced and that, following the Closing, the Selling Entities intend to dissolve and liquidate and, as a result thereof, may reject, terminate or cease any remaining relationships with any other Persons to the extent not constituting a Purchased Asset or an Assumed Liability).

(c)    The covenants and undertakings contained in this Section 7.14 relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this Section 7.14 will cause irreparable injury to the Buyer, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, the Buyer will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this Section 7.14 without the necessity of proving actual damage or posting any bond whatsoever. The rights and remedies provided by this Section 7.14 are cumulative and in addition to any other rights and remedies which the Buyer may have hereunder or at law or in equity.

(d)    The parties hereto agree that, if any court of competent jurisdiction in a Final Order determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 7.14 is unreasonable, arbitrary, unenforceable or against public policy, then a lesser time period, geographical area, business limitation or other relevant feature which is determined to be reasonable, not arbitrary and not against public policy may be enforced against the applicable party.

OC\1697932.15

Section 7.15    <u>Intercompany Arrangements</u>.  Prior to the Closing, the Selling Entities and the Acquired Subsidiaries shall satisfy in full all intercompany accounts payable (or other amounts payable) and other intercompany obligations of any Selling Entity owed by it to any Acquired Subsidiary or of any Acquired Subsidiary owed by it to any Selling Entity with effect prior to or on the Closing Date.  All costs, expenses and other Liabilities incurred in connection with the termination and satisfaction of such intercompany obligations shall be paid or borne solely by the Selling Entities, and the Buyer (and, from and after the Closing, the Acquired Subsidiaries) shall have no liability, obligation or responsibility therefor.

Section 7.16    <u>Damage or Destruction</u>.  Until the Closing, the Purchased Assets shall remain at the risk of the Selling Entities.  In the event of any material damage to or destruction of any of the Purchased Assets after the date hereof and prior to the Closing (in any such case, a "<u>Damage or Destruction Loss</u>"), the Seller shall give prompt written notice thereof to the Buyer. If any such Damage or Destruction Loss is covered by policies of insurance and, if such damage or destruction is to a facility, is not repaired or replaced by a similar facility in reasonable proximity to any former facility, all right and claim of the Selling Entities to any proceeds of insurance for such Damage or Destruction Loss shall be assigned and (if previously received by the Selling Entities and not used prior to the Closing Date to repair any damage or destruction) paid to the Buyer and/or a Buyer Designee at Closing in accordance with <u>Section 2.1(p)</u>.  If any such Damage or Destruction Loss is not covered by policies of insurance (not considering any deductible payable with respect to any policy of insurance), the Buyer shall have the right to reduce the Closing Payment by an amount equal to the lesser of (i) the estimated cost to repair or restore the Purchased Assets affected by such Damage or Destruction Loss (the "<u>Affected Assets</u>") to substantially the same condition that existed immediately prior to the occurrence of such Damage or Destruction Loss, or (ii) if such Affected Assets are destroyed or damaged beyond repair or are not able to be repaired to substantially the same condition that existed prior to such Damage or Destruction Loss at a cost less than their replacement cost, the replacement cost of the Affected Assets.  If the Buyer elects to reduce the Closing Payment pursuant to this <u>Section 7.16</u>, the Seller and the Buyer shall negotiate in good faith in an effort to agree upon the amount of such reduction.  If the parties are unable to reach agreement within five (5) Business Days after notice of the Damage or Destruction Loss is given by the Selling Entities, then the amount of the reduction shall be determined by an independent, qualified insurance adjuster selected by the Parties (or, if they are unable to agree on such selection, one appointed by the Bankruptcy Court upon application of either Party).

Section 7.17    <u>Permits</u>.  Commencing on the date of this Agreement, the Parties, cooperating in good faith, at the Seller's sole cost and expense, shall use commercially reasonable efforts to take such steps, including the filing of any required applications with Governmental Authorities, as may be necessary (i) to effect the transfer of Permits that are Purchased Assets to the Buyer on or as soon as practicable after the Closing Date, to the extent such transfer is permissible under applicable Law, and (ii) to enable the Buyer to obtain, on or as soon as practicable after the Closing Date, any additional licenses, permits, approvals, consents, certificates, registrations, and authorizations (whether governmental, regulatory, or otherwise) as may be necessary for the lawful operation of the Business from and after the Closing Date.

Section 7.18    <u>Suppliers and Distributors; Certain Avoidance Actions; Insurance Policies</u>.

OC\1697932.15

(a)    The Selling Entities shall, and shall cause the Acquired Subsidiaries to, promptly following the request thereof by the Buyer, seek and use their respective commercially reasonable efforts to arrange such meetings and telephone conferences with material suppliers and distributors of the Selling Entities and the Acquired Subsidiaries as may be reasonably requested by the Buyer and necessary and appropriate for the Buyer to coordinate transition of such suppliers and distributors with the Business following the Closing; *provided* that Representatives of Seller shall be entitled to attend any such meeting or telephone conference.

(b)    The Selling Entities shall not pursue any Avoidance Actions against any current or former employee, supplier, vendor or landlord of the Selling Entities or the Business who is a party to a Contract or a Real Property Lease that is, or is intended to be, an Assumed Agreement or Assumed Real Property Lease, and each of the Selling Entities hereby releases, subject to the occurrence of and effective as of the Closing, any rights it may have with respect to any such Avoidance Actions.

(c)    To the extent that any current or prior insurance policy of any of the Selling Entities relate to the Purchased Assets or Assumed Liabilities (excluding and Excluded Insurance Policies) and such insurance policy is not transferable to Buyer or a Buyer Designee at the Closing in accordance with the terms hereof, the Selling Entities shall hold such insurance policy for the benefit of Buyer or such Buyer Designee, shall reasonably cooperate with Buyer (at the Seller's cost and expense) in pursuing any claims thereunder, and shall pay over to Buyer promptly any insurance proceeds paid or recovered thereunder with respect to the Purchased Assets or the Assumed Liabilities.  In the event Buyer determines to purchase replacement coverage with respect to any such insurance policy, the Selling Entities shall reasonably cooperate with Buyer to terminate such insurance policy and shall, at the option of Buyer, promptly pay over to Buyer any refunded or returned insurance premiums received by any Selling Entities in connection therewith or cause such premiums to be applied by the applicable carrier to the replacement coverage arranged by Buyer.

Section 7.19    Notification of Certain Matters.  Each Party shall give prompt written notice to the other Party of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would cause any of its respective representations or warranties in this Agreement to be untrue or inaccurate in any material respect at or prior to the Closing Date or (ii) any failure to comply with or satisfy any of its respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided, however,* (x) the delivery of any notice pursuant to this Section 7.19 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement, and (y) any failure to comply with this Section 7.19 shall not be taken into account in determining whether the conditions to closing set forth in ARTICLE VIII have been or would be satisfied.

OC\1697932.15

Section 7.20    Collection of Accounts Receivable.

(a)    As of the Closing Date, each Selling Entity hereby (i) authorizes the Buyer or any Buyer Designee to open any and all mail addressed to any Selling Entity relating to the Purchased Assets and delivered to the offices of the Business or otherwise to Buyer or any Buyer Designee if received on or after the Closing Date and (ii) appoints the Buyer, any Buyer Designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by the Buyer of any Buyer Designee after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, made payable or endorsed to any Selling Entity or Selling Entity's order, for the Buyer's or any Buyer Designee's own account.

(b)    As of the Closing Date, each Selling Entity agrees that any monies, checks or negotiable instruments received or identified by any Selling Entity after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed by the Buyer after the Closing, as the case may be, shall be held in trust by such Selling Entity for the Buyer's or any Buyer Designee's benefits and accounts, not commingled with other funds of such Selling Entity, and promptly upon receipt by a Selling Entity of any such payment, such Selling Entity shall pay over to the Buyer or its designee the amount of such payments without any right of set off or reimbursement. In addition, the Buyer agrees that, after the Closing, it will hold and will promptly transfer and deliver to the Seller, from time to time as and when received or identified by the Buyer or its Affiliates, any cash, checks with appropriate endorsements, payment of an account, trade, note receivable or other payment or property or assets that the Buyer or its Affiliates may receive or identify on or after the Closing which properly belongs to the Selling Entities as an Excluded Asset.

(c)    As of the Closing Date, the Buyer or any Buyer Designee shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed by the Buyer after the Closing.

(d)    Notwithstanding anything to the contrary contained hereto, any Buyer Designees who acquire any Accounts Receivable that are Purchased Assets hereunder shall be express third party beneficiaries of this Section 7.20.

Section 7.21    Cure Payments; Cure of Defaults.    Subject to entry of the Sale Order, the Seller shall, on or prior to the Closing, pay the Cure Payments and cure any and all other defaults and breaches under the Assumed Agreements and Assumed Real Property Leases so that such Contracts may be assumed by the Selling Entities and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement, which Cure Payment costs, to the extent they do not exceed $1,000,000 in the aggregate (the "Buyer Cure Amount Cap"), shall be borne (a) 50% by Buyer (such amount, the "Buyer Cure Payment Allocation"), and (b) 50% by Seller; *provided* that in no event shall Buyer be responsible for any Cure Payments in excess of 50% of the Buyer Cure Amount Cap (or any portion thereof), and Seller shall bear any and all Cure Payments in excess of the Buyer Cure Payment Allocation. Seller agrees that it will promptly take such actions as are reasonably necessary to obtain a Final Order of the Bankruptcy Court providing for the assumption and assignment of such Contracts. To the extent Seller is responsible for any Cure Payments pursuant to the terms hereof, the Buyer may,

OC\1697932.15

in its sole discretion and upon prior written notice to Seller, pay such amount(s) on behalf of Seller, in which case Seller shall have no further responsibility therefor, and offset such amount(s) against any amount(s) Buyer may owe the Seller (including by deducting such amounts, at the Closing, from the Purchase Price or, without duplication, recovering such amounts from the Closing Payment).

Section 7.22  <u>Post-Closing Assignment of Contracts</u>.  With respect to any Contract which is not an Assumed Agreement or Assumed Real Property Lease on the Closing Date and provided such Contract has not been rejected by Seller after the Closing Date pursuant to section 365 of the Bankruptcy Code, upon written notice(s) from Buyer to Seller given at any time after the Closing Date, Seller shall promptly take all actions reasonably necessary to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any such Contract(s) set forth in Buyer's notice(s); *provided* that any Cure Payment applicable thereto shall be satisfied solely by Buyer, and *provided* that such assumption and assignment (and payment by the Buyer of such Cure Payment), shall not affect the amount of the Purchase Price.  Notwithstanding anything in this Agreement to the contrary, on the date any such Contract is assumed and assigned to Buyer pursuant to this <u>Section 7.22</u>, such Contract shall thereafter be deemed a Purchased Asset for all purposes under this Agreement.

Section 7.23  <u>Notification of Competing Bids</u>.  From the date hereof until the eleventh (11th) day after the date hereof, the Selling Entities shall not, and shall cause their Representatives and Affiliates not to, directly or indirectly, (a) initiate contact with, pursue, knowingly facilitate, solicit or encourage submission of, or discuss, negotiate or assist with, any inquiries, proposals or offers by any Person (other than Buyer and its Affiliates and Representatives) with respect to a Competing Bid or (b) provide any Person (other than Buyer and its Affiliates, agents and Representatives) with access to the books, records, operating data, contracts, documents or other information in connection with any Competing Bid.  Each Selling Entity shall, and shall cause its Affiliates and Representatives to, (a) immediately cease and cause to be terminated any and all contacts, discussions and negotiations with any Person other than the Buyer and its Affiliates and Representatives regarding the foregoing, in each case until the date the Bankruptcy Court enters the Bidding Procedures Order; (b) promptly notify Buyer if any Competing Bid, or any inquiry or contact with any Person with respect thereto which has been made as of the date of this Agreement or is subsequently made, and the details of such contact (including the identity of the third party or third parties and copies of any proposals and the specific terms and conditions discussed or proposed); and (c) keep the Buyer fully informed with respect to the status of the foregoing.  The Selling Entities shall not, without the prior consent of the Buyer, release any Person from, or waive any provision of, any standstill agreement or confidentiality agreement to which any Selling Entity is a party.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.1  <u>Conditions to Each Party's Obligations to Effect the Closing</u>.  The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following conditions:

OC\1697932.15

(a)     consummation of the transactions contemplated hereby would not violate any Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction in effect, and there shall not be any (i) Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited or (ii) a Legal Proceeding commenced by or before a Governmental Authority having competent jurisdiction that is pending and that, if determined adversely to a Party hereto, would reasonably be expected to make the consummation of the transactions contemplated hereby illegal or otherwise prohibited;

(b)     all filing and waiting periods (including any extensions thereof) applicable to the consummation of the transactions contemplated by this Agreement under the Antitrust Laws shall have expired or been terminated, and all consents or approvals required for the consummation of the transactions contemplated by this Agreement under any Antitrust Laws shall have been obtained; and

(c)     the Bankruptcy Court shall have entered the Sale Order in form and substance acceptable to Buyer in its sole discretion and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Buyer in its sole discretion).

Section 8.2     Conditions to Obligations of the Buyer.  The obligation of the Buyer to effect the purchase of the Purchased Assets and the assumption of the Assumed Liabilities and to consummate the other transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following additional conditions:

(a)     the Selling Entities shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by them on or prior to the Closing Date;

(b)     (i) the representations and warranties of the Selling Entities set forth in ARTICLE V that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects, and (ii) all other representations and warranties of the Selling Entities set forth in ARTICLE V shall be true and correct in all material respects, in each case of clauses (i) and (ii) as of the date of this Agreement, and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)     the Buyer shall have received a certificate from an officer of the Seller as such to the effect that the conditions set forth in Sections 8.2(a), (b), (i), and (j)Section 8.2(b) have been satisfied;

(d)     the Buyer shall have received the other items to be delivered to it pursuant to Section 4.2;

(e)     since the date of this Agreement, there shall not have occurred any Material Adverse Effect;

OC\1697932.15

(f)    the Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance acceptable to Buyer in its sole discretion and such Bidding Procedures Order shall be a Final Order (unless such Final Order requirement is waived by the Buyer in its sole discretion);

(g)    the Bankruptcy Court shall have entered one or more orders (which may be the Sale Order), in form and substance acceptable to Buyer in its sole discretion, approving the assumption and assignment of the Assumed Agreements and Assumed Real Property Leases to the Buyer pursuant to Section 365 of the Bankruptcy Code and such order(s) shall be Final Orders (unless such Final Order requirement is waived by the Buyer in its sole discretion);

(h)    the Cure Payments shall have been paid by, or on behalf of, the Selling Entities;

(i)    (A) at least 80% of the Business Employees identified on Schedule 8.2(i) shall have agreed to be employed by the Buyer or a Buyer Designee as of the Closing or to remain employed by the relevant Acquired Subsidiary following the Closing, as applicable, on the terms and conditions described in Section 7.7(a), and shall not have indicated that they intend to leave their employment after the Closing Date, and (B) at least 70% of the Business Employees other than those identified on Schedule 8.2(i) shall have agreed to be employed by the Buyer or a Buyer Designee as of the Closing or to remain employed by such Acquired Subsidiary following the Closing, as applicable, on the terms and conditions described in Section 7.7(a), and shall not have indicated that they intend to leave their employment after the Closing Date;

(j)    all Consents of any third Person required under the Contracts set forth on Schedule 8.2(j) in connection with the consummation of the transactions contemplated by this Agreement shall have been delivered to the Buyer in form and substance reasonably acceptable to the Buyer; and

(k)    the Selling Entities shall have delivered to the Prepetition Senior Lender (as defined in the Interim DIP Order) an amount equal to $1,000,000 in further satisfaction of the principal amount due under the Prepetition Senior Loans (as defined in the Interim DIP Order), or a written instruction to Buyer that such amount shall be paid directly from the Purchase Price (which amount Buyer may pay directly to the Prepetition Senior Lender (as defined in the Interim DIP Order) and deduct from such Purchase Price otherwise payable hereunder).

Any condition specified in this Section 8.2 (other than the condition in Section 8.2(k)), or any condition in Section 8.1 for the benefit of the Buyer, may be waived by the Buyer in its sole discretion; *provided* that no such waiver shall be effective against the Buyer unless it is set forth in a writing executed by the Buyer; *provided, further*, that the condition in Section 8.2(k) may not be waived by the Buyer without the prior written consent of the Prepetition Senior Lender (as defined in the Interim DIP Order), which consent may be granted or withheld in its sole discretion.

Section 8.3    Conditions to Obligations of the Selling Entities. The obligation of the Selling Entities to effect the sale of the Purchased Assets and to consummate the other

OC\1697932.15

transactions contemplated by this Agreement shall be subject to the satisfaction at or prior to the Closing of the following additional conditions:

(a)    the Buyer shall have performed and complied in all material respects with the covenants and agreements contained in this Agreement which are required to be performed and complied with by the Buyer on or prior to the Closing Date;

(b)    (i) the representations and warranties of the Buyer set forth in ARTICLE VI that are qualified by materiality shall be true and correct in all respects, and (ii) all other representations and warranties of the Buyer set forth in ARTICLE VI shall be true and correct in all material respects, in each case of clauses (i) and (ii) as of the date of this Agreement, and as of the Closing Date as though made at and as of the Closing Date (except for those representations and warranties which address matters only as of an earlier date in which case such representation or warranty shall have been true and correct as of such earlier date);

(c)    the Seller shall have received a certificate from an officer of the Buyer as such to the effect that the conditions set forth in Section 8.3(a) and Section 8.3(b) have been satisfied; and

(d)    the Seller shall have received the other items to be delivered to it pursuant to Section 4.3.

Any condition specified in this Section 8.3, or any condition in Section 8.1 for the benefit of the Selling Entities, may be waived by the Seller in its sole discretion; *provided* that no such waiver shall be effective against the Seller unless it is set forth in a writing executed by the Seller.

Section 8.4    Frustration of Closing Conditions.  None of the Selling Entities or Buyer may rely on or assert the failure of any condition set forth in ARTICLE VIII to be satisfied if such failure was proximately caused by such Party's failure to comply with this Agreement in all material respects.

## ARTICLE IX
## TERMINATION; WAIVER

Section 9.1    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Seller and the Buyer;

(b)    by the Seller or the Buyer, at any time in their respective sole discretion, if:

(i)    there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or

(ii)    consummation of the transactions contemplated hereby would violate any non-appealable Final Order, decree or judgment of the Bankruptcy Court or any other Governmental Authority having competent jurisdiction;

OC\1697932.15

*provided* that the actions of the Party seeking to terminate this Agreement pursuant to this Section 9.1(b) shall not have been a principal cause of the entry of such Law, order, decree or judgment;

    (c)    by the Seller, at any time in its sole discretion, if:

        (i)    any of the representations and warranties of Buyer contained in ARTICLE V shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 8.3(b) would not then be satisfied; or

        (ii)    Buyer shall have failed to perform or comply with any of the covenants or agreements contained in this Agreement to be performed and complied with by the Buyer such that the condition set forth in Section 8.3(a) would not then be satisfied;

*provided, however,* that if an inaccuracy in any of the representations and warranties of the Buyer or a failure to perform or comply with a covenant or agreement by the Buyer is curable by the Buyer within ten (10) days after the date of written notice from the Seller to the Buyer of the occurrence of such inaccuracy or failure, then the Seller may not terminate this Agreement under this Section 9.1(c) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Buyer or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

    (d)    by the Buyer, at any time in its sole discretion, if:

        (i)    any of the representations and warranties of the Selling Entities contained in ARTICLE VI shall be inaccurate as of the date of this Agreement, or shall have become inaccurate as of a date subsequent to the date of this Agreement (as if made on and as of such subsequent date) such that the condition set forth in Section 8.2(b) would not then be satisfied;

        (ii)    any Selling Entity shall have failed to perform or comply with any of its respective covenants or agreements contained in this Agreement to be performed and complied with by it such that the condition set forth in Section 8.2(a) would not then be satisfied;

*provided, however,* that if an inaccuracy in any of the representations and warranties of the Selling Entities or a failure to perform or comply with a covenant or agreement by any of the Selling Entities is curable by it within ten (10) days after the date of written notice from the Buyer to the Seller of the occurrence of such inaccuracy or failure, then the Buyer may not terminate this Agreement under this Section 9.1(d) on account of such inaccuracy or failure (x) prior to delivery of such written notice to the Seller or during the ten (10) day period commencing on the date of delivery of such notice or (y) following such ten (10) day period, if such inaccuracy or failure shall have been fully cured during such ten (10) day period;

(iii)    the Bankruptcy Court approves an Alternative Transaction;

(iv)    any Selling Entity (A) withdraws the Bidding Procedures and Sale Motion, or publicly announces its intention to withdraw the Bidding Procedures and Sale Motion, (B) moves to voluntarily dismiss any of the Bankruptcy Cases, (C) moves for conversion of any of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or (D) moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Bankruptcy Cases;

(v)    (A) a trustee or an examiner with expanded powers is appointed in any of the Bankruptcy Cases or (B) any of the Bankruptcy Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(vi)    an order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or Sale Order;

(vii)    any court of competent jurisdiction shall enter a final, non-appealable judgment or order declaring this Agreement to be unenforceable;

(viii)    the Selling Entities shall not have filed the Petitions with the Bankruptcy Court on or before the first (1st) Business Day following the date of this Agreement;

(ix)    the Selling Entities shall not have filed the Bidding Procedures and Sale Motion, in form and substance acceptable to the Buyer in its sole discretion, with the Bankruptcy Court on the Petition Date;

(x)    the Bankruptcy Court shall not have entered the Bidding Procedures Order, in form and substance acceptable to the Buyer in its sole discretion, on or prior to the date that is twenty (20) days after the Petition Date, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion;

(xi)    the Auction shall not have commenced on or prior to the date that is two (2) Business Days prior to the Sale Hearing;

(xii)    the Bankruptcy Court shall not have entered the Sale Order, in form and substance acceptable to Buyer in its sole discretion, on or prior to the date that is fifty (50) days after the Petition Date, or such order shall have been stayed, vacated, reversed, modified or amended at any time in any respect without the prior written consent of Buyer given in its sole discretion;

(xiii)    the Closing Date shall not have occurred on or prior to the date that is sixty five (65) days after the Petition Date; or

(xiv)    (A) the Interim DIP Order is not entered by the Bankruptcy Court, or the DIP Facility Effective Date has not occurred, on or before the date that is five (5) days after the Petition Date; (B) the Final DIP Order is not entered by the Bankruptcy

Court on or before the date that is thirty (30) days after the Petition Date; or (C) the occurrence of either an Event of Default (as defined in the DIP Facility) or the Termination Date (as defined in the Interim DIP Order or the Final DIP Order, as applicable) and either (1) the DIP Lender's exercise of remedies with respect to any material portion of the Purchased Asset or (2) the DIP Lender ceases to fund amounts under the DIP Facility in accordance with any budget (which must be acceptable to the Buyer in its sole discretion) established in connection with the DIP Facility; or

(e)    automatically, if the Interim DIP Order (including, without limitation, the Prepetition Senior Loan Paydown (as defined in the Interim DIP Order) is not entered by the Bankruptcy Court on or before the date that is five (5) days after the Petition Date, unless waived by the Buyer and the Prepetition Senior Lender (as defined in the Interim DIP Order) in their respective sole discretion.

Section 9.2    Procedure and Effect of Termination.  In the event of termination of this Agreement by either Seller or Buyer pursuant to Section 9.1, written notice thereof shall forthwith be given by the terminating Party to the other Party (and may be given by Buyer without application to or order of the Bankruptcy Court), specifying the provision hereof pursuant to which such termination is made, and this Agreement shall thereupon terminate and become void and of no further force and effect, and the transactions contemplated hereby shall be abandoned without further action by any of the Parties; *provided, however*, that (a) no Party shall be relieved of or released from any Liability arising from any willful, knowing or intentional breach by such Party of any provision of this Agreement, (b) this Section 9.2, Section 7.3 and Section 7.11, ARTICLE X and the Confidentiality Agreement shall remain in full force and effect and survive any termination of this Agreement, and (c) the Selling Entities shall remain liable for payment of the Buyer Expense Reimbursement and the Termination Fee to the extent set forth herein and in the Bidding Procedures Order.

Section 9.3    Extension; Waiver.  At any time prior to the Closing, the Selling Entities, on the one hand, or the Buyer, on the other hand, may, without application to or order of the Bankruptcy Court (a) extend the time for the performance of any of the obligations or other acts of the Buyer (in the case of an agreed extension by the Selling Entities) or the Selling Entities (in the case of an agreed extension by the Buyer), (b) waive any inaccuracies in the representations and warranties of the Buyer (in the case of a wavier by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the Buyer (in the case of a wavier by the Selling Entities) or the Selling Entities (in the case of a waiver by the Buyer) contained herein, or (d) waive any condition to its obligations hereunder. Any agreement on the part of the Selling Entities, on the one hand, or the Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of the Selling Entities or the Buyer, as applicable, without the need for any application to or order of the Bankruptcy Court. The failure or delay of any Party to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of those rights, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise of any rights hereunder.

69

# ARTICLE X
## MISCELLANEOUS PROVISIONS

Section 10.1   Amendment and Modification.   This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of each of the Selling Entities and Buyer; *provided* that (a) Buyer reserves the right to make one or more of the following unilateral modifications to the structure of the transactions contemplated hereby, and (b) the Selling Entities will cooperate with the Buyer, including by amending this Agreement, in connection with any such modifications:

(a)   purchasing certain assets and assuming certain related liabilities of one or more of the Acquired Subsidiaries, rather than purchasing the Equity Interests of any such Acquired Subsidiaries;

(b)   (i) entering into a Transitional Supply Agreement and an Advisory Agreement at the Closing; (ii) excluding the assets to be solely used in the Transitional Supply Business from Purchased Assets (it being understood that such assets shall then constitute Excluded Assets hereunder); (iii) excluding the Transitional Supply Business from the definition of "Business"; and (iv) excluding any or all employees of the Selling Entities located in Taiwan, who will then remain with the Selling Entities in connection with the Transitional Supply Business, from the definition of "Business Employees"; and

(c)   making any other modifications to the structure as may be reasonably necessary or advisable to implement the foregoing clauses (a) and (b).

Section 10.2   Survival.   None of the representations and warranties of the Parties in this Agreement, in any instrument delivered pursuant to this Agreement, or in the Schedules or Exhibits attached hereto shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing. None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (a) the covenants and agreements of the Parties contained in this ARTICLE X and in ARTICLE III and ARTICLE IV and (b) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transaction contemplated by this Agreement until fully performed.

Section 10.3   Notices.   All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) upon confirmation of receipt when transmitted by electronic mail, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

(a)   If to the Seller or the Selling Entities, to:

70

OC\1697932.15

OCZ Technology Group, Inc.
6373 San Ignacio Ave
San Jose, California 95119
Attention:    Ralph Schmitt
Email:         ralph.schmitt@ocztechnology.com

with a copy (which shall not constitute notice) to:

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Attention:    Sean T. Scott
Email:         stscott@mayerbrown.com

(b)    If to the Buyer, to:

Legal Affairs Division
Semiconductor & Storage Products Company
Toshiba Corporation
1-1, Shibaura 1-chome
Minato-ku, Tokyo 105-8001, Japan
Attention:    Takahiro Asakura
Email:         takahiro.asakura@toshiba.co.jp

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, California  92626
Attention:    Charles K. Ruck        Charles.Ruck@lw.com
              Robert Klyman          Robert.Klyman@lw.com
              Joshua M. Dubofsky     Josh.Dubofsky@lw.com

Section 10.4    Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties, and any such assignment shall be null and void; *provided* that the rights of the Buyer under this Agreement may be assigned by the Buyer, without the prior written consent of any Selling Entity, to one or more Buyer Designees, so long as the Buyer shall continue to remain obligated in full hereunder.  No assignment by any Party (including an assignment by Buyer to any Buyer Designee) shall relieve such Party of any of its obligations hereunder.  Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns, including, in the case of the Selling Entities, any trustee in the Bankruptcy Case or in any subsequent Chapter 7 case.

Section 10.5    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms,

71

conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 10.6    <u>Governing Law</u>.    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and all claims and causes of action arising out of, based upon, or related to this Agreement or the negotiation, execution or performance hereof, shall be governed by, and construed, interpreted and enforced in accordance with, the Laws of the State of Delaware, without regard to choice or conflict of law principles that would result in the application of any Laws other than the Laws of the State of Delaware.

Section 10.7    <u>SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL</u>.

(a)    Any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby and the proceedings related thereto shall be brought solely in the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court). Each Party hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in respect of any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder, and agrees that it will not bring any action arising out of, based upon or related thereto in any other court; *provided, however,* that, if the Bankruptcy Case is dismissed, any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or the transactions contemplated hereby shall be heard and determined solely in the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware and any direct appellate court therefrom). Each Party hereby irrevocably waives, and agrees not to assert as a defense, counterclaim or otherwise, in any such action, claim, suit or Legal Proceeding, (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with <u>Section 10.3</u>, (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Law, any claim that (i) the suit, action or Legal Proceeding in such court is brought in an inconvenient forum, (ii) the venue of such suit, action or Legal Proceeding is improper or (iii) this Agreement or any other agreement or instrument contemplated hereby or entered into in connection herewith, or the subject matter hereof or thereof, may not be enforced in or by such courts. Each Party agrees that notice or the service of process in any action, claim, suit or Legal Proceeding arising out of, based upon or relating to this Agreement or any of the rights and obligations arising hereunder or thereunder, shall be properly served or delivered if delivered in the manner contemplated by <u>Section 10.3</u>.

OC\1697932.15

(b)     EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT SUCH PARTY MAY HAVE TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION OR PERFORMANCE HEREOF.

Section 10.8   Counterparts.   This Agreement may be executed by facsimile or pdf format and in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement, and which shall become effective when one or more counterparts have been signed by each of the Parties and delivered (by facsimile, pdf format or otherwise) to the other Parties.

Section 10.9   Incorporation of Schedules and Exhibits.   All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

Section 10.10   Entire Agreement.   This Agreement (including all Schedules and all Exhibits), the Transaction Documents and the Confidentiality Agreement constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

Section 10.11   Remedies.   The Parties agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.   It is accordingly agreed that, prior to any valid termination of this Agreement as provided in Section 9.1, the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

Section 10.12   Mutual Drafting; Headings; Information Made Available.   The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.   If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.   The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.   To the extent this Agreement refers to information or documents to be made available (or delivered or provided) to Buyer or its Representatives, the Selling Entities shall be deemed to have satisfied such obligation if the Seller or any of its Representatives has made such information or document available (or delivered or provided such information or document) to Buyer or any of its Representatives in an electronic data room or via electronic mail prior to the date of this Agreement.

73

Section 10.13 <u>Seller Disclosure Schedule</u>. It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or subsection to the extent the applicability of such disclosure to such other section or subsection is readily apparent on the face of such disclosure, (b) the disclosure of any matter or item in the Seller Disclosure Schedule shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, and (c) the mere inclusion of an item in the Seller Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to have a Material Adverse Effect.

Section 10.14 <u>No Third Party Beneficiaries</u>.

Except as expressly provided in <u>Section 7.20</u>, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment at all or for any specified period.

Section 10.15 <u>Bulk Sales Law</u>.

The Buyer hereby waives compliance by the Selling Entities with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Buyer. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

* * * * *

74

IN WITNESS WHEREOF, the Parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above.

**SELLER**

**OCZ TECHNOLOGY GROUP, INC.**

By: _____

Name:  Ralph Schmitt

Title:   President and Chief Executive Officer

**SELLING ENTITIES**

**INDILINX, INC.**

By _____

Name:  Ralph Schmitt

Title:   Chief Executive Officer

**SANRAD, INC.**

By _____

Name:  Ralph Schmitt

Title:   Chief Executive Officer

**[Signature Page to Asset Purchase Agreement]**

**BUYER:**

TOSHIBA CORPORATION

By: _____
Name: Yasuo Naruke
Title: Corporate Senior Vice President
President & CEO
Semiconductor & Storage Products
Company

[Signature Page to Asset Purchase Agreement]

# EXHIBIT 2

## RSA

## RESTRUCTURING SUPPORT AND SUBORDINATION AGREEMENT

This RESTRUCTURING SUPPORT AND SUBORDINATION AGREEMENT is made and entered into as of December 2, 2013 (the "Agreement") by and among Toshiba Corporation (together with its designees and affiliates, "Toshiba") and Hercules Technology Growth Capital, Inc. (together with its successors and affiliates, "Hercules") with respect to Toshiba's (i) acquisition of substantially all of the assets of OCZ Technology Group, Inc. ("OCZ") and its direct and indirect subsidiaries (together with OCZ, the "Company" or the "Debtors") pursuant to sections 105, 363 and 365 of title 11, United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), free and clear of all liens claims and interests (the "Sale"), and (ii) provision of priming, first priority secured debtor-in-possession financing to the Company pursuant to section 364 of the Bankruptcy Code (the "DIP Financing" and together with the Sale, the "Transactions").  Hercules and Toshiba, and any subsequent person that becomes a party hereto in accordance with the terms hereof, are each referred to herein as a "Party" and collectively as the "Parties."

## W I T N E S S E T H:

WHEREAS, as of November 25, 2013, the Debtors were obligated pursuant to a term loan in an aggregate principal amount of $9,716,963.50 (prior to the application of cash collateral received by Hercules from on and after November 25, 2013 to on or before the Petition Date), plus accrued and unpaid interest, fees and other amounts (the "Pre-Petition First Lien Debt") under that certain Loan and Security Agreement dated as of March 11, 2013 (as amended, the "Existing Credit Agreement"), by and between Hercules and the Debtors.  In addition, the obligations under the Existing Credit Agreement owed to Hercules include third lien priority debt and security interest in the Debtors Assets in the principal amount of $6,500,000 (the "Prepetition Third Lien Debt" and together with the Pre-Petition First Lien Debt and all other claims and obligations under the Existing Credit Agreement, the "Existing Credit Agreement Obligations").

WHEREAS, the Existing Credit Agreement is secured by first priority liens on and security interests in substantially all of the Debtors' assets, except as otherwise provided in those certain Subordination Agreements dated on or about August 12, 2013 (the "Subordination Agreements") by and between Hercules and the holders of claims (the "Debenture Creditors") against the Debtors arising pursuant to that certain 9% Senior Secured Convertible Debenture due August 13, 2014 (the "Debenture") and all claims and obligations arising thereunder, the "Debenture Obligations").  As of the date hereof, the outstanding principal amount of Debenture Claims totaled $13,098,500. The Debenture Claims are secured by second priority liens on and security interests in substantially all of the Debtors' assets, except as provided in the Subordination Agreements. Pursuant to the Subordination Agreements, the Debenture Creditors' subordinated the Debenture Claims to the Existing Credit Agreement Obligations, other than the Prepetition Third Lien Debt, which is subordinate to payment of the Debenture Obligations.

WHEREAS, pursuant to the Subordination Agreements, Hercules has the right to consent on behalf of the Debenture Creditors to, among other things, (i) the use of cash collateral and (ii) the sale of collateral, including pursuant to section 363 of the Bankruptcy Code free and clear of

all liens, claims and interests, and to prohibit any challenge by the Debenture Creditors to the DIP Financing, whether on the basis of adequate protection or otherwise.

WHEREAS, Exhibit A hereto is a substantially final form of Asset Purchase Agreement dated as of December 2, 2013 (the "Purchase Agreement"),[1] by and among Toshiba and the Debtors, pursuant to which Toshiba and the Debtors agreed to consummate the Sale, subject to (a) the terms and conditions set forth in the Purchase Agreement and (b) higher and better offers submitted in accordance with the Bidding Procedures Order.

WHEREAS, Exhibit B hereto is a substantially final draft of Interim DIP Order establishing the terms of the DIP Financing (the "Interim DIP Order"), pursuant to which Toshiba or an affiliate thereof (in its capacity as such, the "DIP Lender") intends to make the DIP Financing available to the Debtors (subject to court approval and the terms thereof). The Interim DIP Order, the Final DIP Order and any other definitive documents relating to the DIP Financing (which in all cases shall be consistent with the Interim DIP Order and otherwise acceptable to the DIP Lender in its sole discretion (and, as to any provision that affects the Hercules Paydown (as defined below) or Hercules Closing Paydown (as defined below), Hercules, in its sole discretion) are collectively referred to herein as the "DIP Documents." The term "DIP Facility" means the "Postpetition Facility" (as defined in the Interim DIP Order), and the term "DIP Commitment" refers to the commitments and obligations of the DIP Lender to make loans and advances under the DIP Facility.   Any and all claims and obligations arising in favor of Toshiba under the DIP Facility, the Interim DIP Order, the Final DIP Order, or otherwise in connection with the DIP Financing are referred to collectively herein as the "DIP Obligations."

WHEREAS, on or before December 2, 2013 the Debtors intend to commence voluntary cases (each, a "Bankruptcy Case" and, collectively, the "Bankruptcy Cases", and the date of filing the Bankruptcy Cases being referred to herein as the "Petition Date") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and seek approval of the Sale (subject to higher and better offers in accordance with the Bidding Procedures) and the DIP Financing (in each case conditioned upon Bankruptcy Court approval and entry of the Interim DIP Order and, immediately upon the initial advance under the DIP Facility, the payment to Hercules of the Hercules Paydown).

WHEREAS, subject to execution of definitive documentation and appropriate approvals by the Bankruptcy Court, this Agreement sets forth the terms and conditions of the Parties' respective obligations hereunder.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

---

[1]    Capitalized terms used and not otherwise defined herein have the meanings given to them in the Purchase Agreement.

2

OC\1705799.10

Section 1.    <u>Support Commitments.</u>

(a)    *Hercules Commitment.*    Hercules agrees and covenants that, upon Bankruptcy Court approval of the Hercules Paydown and the immediate payment thereof at the time of the initial advance under the DIP Facility:

(1)    It will consent to and support (A) the prompt entry by the Bankruptcy Court of the Bidding Procedures Order approving the Bidding Procedures, (B) the prompt sale of all or substantially all of the Debtors' assets free and clear of all liens claims and interests pursuant to the Bidding Procedures Order, including, without limitation, the Sale to Toshiba in the event Toshiba's bid is determined by the Debtors to be highest or best, and (iii) the DIP Financing (and the Debtors' use of cash collateral in connection therewith).

(2)    It consents to, and agrees to take all other commercially reasonable actions to enforce its rights under the Subordination Agreements to cause the Debenture Creditors to consent to and/or not to oppose, (A) the priming of the liens and security interests securing the Existing Credit Agreement Obligations and the Debenture Obligations, and the use of Hercules' and the Debenture Creditors' cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code) in exchange for the adequate protection liens and payments set forth in the Interim DIP Order, and (B) the Sale (subject to higher and better bids in accordance with the Bidding Procedures Order).

(3)    It shall not make any assignment, sale, participation, grant, conveyance, or other transfer (collectively, "<u>Transfer</u>") of any portion of its right, title, or interests in the obligations owed by the Company under the Existing Credit Agreement, unless the recipient of such Transfer shall have agreed, in writing, to be bound by the terms hereof.

(4)    It will not, and will take all commercially reasonable actions to enforce its rights under the Subordination Agreements to cause the Debenture Creditors not, to (A) object to, delay, impede, commence any proceeding, or take any other action to interfere, directly or indirectly, in any material respect with the acceptance or implementation of the Transactions, (B) encourage or support any person or entity to do any of the foregoing, or (C) seek or solicit, propose, file, support, encourage, vote for, consent to, instruct, or engage in discussions with any person or entity concerning any restructuring, workout, plan of reorganization, dissolution, winding up, sale process, or liquidation of the Debtors Company and its affiliates, other than the Transactions contemplated hereby.

(5)    It will use commercially reasonable efforts to take or cause to be taken all actions commercially reasonably necessary to consummate the Transactions on the terms and subject to the conditions set forth in the Purchase Agreement (subject to higher and better bids in accordance with the Bidding Procedures) and the DIP Financing Term Sheet.

(b)    *Toshiba Commitment.* Toshiba agrees and covenants that:

(1)    It will support, and use commercially reasonable efforts to obtain, Bankruptcy Court approval to lend to the Debtors an amount up to the "Maximum Amount" (as defined in the Interim DIP Order), which will include the following payment to Hercules, and which shall be paid immediately out of the proceeds of the initial advance under the DIP Facility

3

by the Debtors: (A) $9,716,963.50, which represents the unpaid principal balance of the Pre-Petition First Lien Debt as of November 25, 2013, *minus* (B) any and all amounts received by Hercules on and after November 25, 2013 and on or before the Petition Date (including, without limitation, all amounts received from the deposit accounts of any Debtor) *minus* (C) $1,000,000, to be used by the Debtors solely to pay the obligations owing to Hercules under the Pre-Petition First Lien Debt (the "Hercules Paydown"). In addition, Toshiba shall support and use commercially reasonable efforts to obtain Bankruptcy Court approval in the Interim DIP Order of the payment of an additional $1,000,000 to Hercules, on account of the remaining, unpaid principal balance under the Prepetition First Lien Debt, directly out of the proceeds of any sale of the Debtors' assets pursuant to the Bidding Procedures (the "Hercules Closing Paydown"), which shall also be included as a non-waivable requirement of the Purchase Agreement. Without further obligating Toshiba, Hercules reserves the right and shall be entitled to seek from the Debtors the proceeds of the sale of the Debtors' assets in excess of the Hercules Closing Paydown in payment of any remaining Prepetition First Lien Debt and thereafter in accordance with the priority of claims in the Bankruptcy Case.

(2)    It will support and use commercially reasonable efforts to obtain entry of the Interim DIP Order, including provisions that authorize the Debtors to borrow sufficient amounts under the DIP Facility to enable the Debtors to pay the Hercules Paydown in accordance with the terms set forth in the Interim DIP Order, and the Purchase Agreement shall include a provision terminating such agreement if the Hercules Paydown is not approved.

Notwithstanding anything herein to the contrary, the Hercules Paydown and any other payments to Hercules shall be without prejudice to the rights of any creditor or party in interest to challenge the validity, perfection and/or priority of the Pre-Petition First Lien Debt, and including to seek disgorgement of the Hercules Paydown and such other amounts, subject to the limitations and as provided in the Interim DIP Order and the Final DIP Order. Notwithstanding anything herein to the contrary, neither Toshiba nor any of its Affiliates shall be responsible for the direct payment or reimbursement of any amounts owed to Hercules, including, without limitation, the Hercules Paydown, all of which shall be the sole and exclusive obligation and responsibility of the Debtors; provided that, the Purchase Agreement shall include the authorization of the Debtors for Toshiba to make the Hercules Paydown directly to Hercules from the initial advance under the DIP Facility..

Section 2.    Subordination and Stand Still.

(a)    *Priorities*. Conditioned upon payment of the Hercules Paydown and subject to approval in the Interim DIP Order of the Hercules Closing Paydown, the DIP Obligations shall be secured by the liens and security interests in the "Postpetition Collateral" (as defined in the Interim DIP Order). Hercules hereby acknowledges and agrees that any and all liens and security interests on the Postpetition Collateral securing or purporting to secure the DIP Obligations shall at all times be senior and prior in any and all respects to any lien on or security interest in such Postpetition Collateral securing or purporting to secure any Existing Credit Agreement Obligations or the Debenture Obligations, and any lien on or security interest in the Postpetition Collateral securing or purporting to secure any such Existing Credit Agreement Obligations or Debenture Obligations shall at all times be junior and subordinate in all respects to a lien on or security interest in such Postpetition Collateral securing or purporting to secure

4

any Existing Credit Agreement Obligation.  Hercules covenants and agrees to use commercially reasonable efforts to enforce the Subordination Agreements with respect to the Debenture Creditors and Debenture Obligations.

(b)    *No Alteration of Priority.*  The priority of the liens and security interests securing the DIP Obligations, and the rights and obligations of the Parties under this Agreement, will remain in full force and effect irrespective of  (a) how such lien or security interest was acquired (whether by grant, possession, statute, operation of law, subrogation, judgment or otherwise), (b) the time, manner, or order of the grant, attachment, filing, recordation, or perfection of a lien or security interest, (c) any conflicting provision of the UCC or other applicable law, (d) any defect or deficiencies in, or non-perfection (including any failure to perfect or lapse in perfection), setting aside, recharacterization, or avoidance of, any lien or security interest securing the DIP Obligations, Existing Credit Agreement Obligation or Debenture Obligation, (e) the modification, subordination or recharacterization of a DIP Obligation, Existing Credit Agreement Obligation or a Debenture Obligation, (f) the modification of any document relating to the DIP Facility or the Existing Credit Agreement, Debenture, or any document related thereto, (g) the voluntary or involuntary subordination of a lien on or security interest in Postpetition Collateral securing a DIP Obligation to a lien on or security interest securing another obligation of any other person, (h) the exchange of a lien on or security interest in any Postpetition Collateral for a lien on or security interest in other Postpetition Collateral, (i) the commencement of an bankruptcy or other insolvency proceeding, or (j) any other circumstance whatsoever, including a circumstance that might be a defense available to, or a discharge of, an obligor in respect of a DIP Obligation, an Existing Credit Agreement Obligation, or a Debenture Obligation, or holder of such obligation, and notwithstanding any conflicting terms or conditions which may be contained in any other document.

(c)    *Perfection; Contesting Liens.*    (i) The DIP Lender will be solely responsible for perfecting and maintaining the perfection of its liens on and security interests in the Postpetition Collateral, and (ii) Hercules will be solely responsible for perfecting and maintaining the perfection of its liens on and security interests in the collateral securing the Existing Credit Agreement Obligations.  The DIP Lender will have no liability to Hercules for (and the Hercules hereby waives any claim arising from) any action or inaction by the DIP Lender with respect to any DIP Document, DIP Obligations or Postpetition Collateral, including (A) the maintenance, preservation, or collection of the DIP Obligations or any Postpetition Collateral, and (B) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any Postpetition Collateral, including any such action or inaction that results in a default or event of default under the Existing Credit Agreement or any documents related thereto.  Other than with respect to Hercules' obligations under this Agreement or the rights and priorities established by the Interim DIP Order, Hercules shall have no liability to the DIP Lender for (and the DIP Lender hereby waives any claim arising from) any action or inaction by Hercules with respect to the Existing Credit Agreement, any document related thereto, the Existing Credit Agreement Obligations or the collateral supporting such obligations, including (A) the maintenance, preservation, or collection of the Existing Credit Agreement Obligations or the collateral supporting such obligations, and (B) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any collateral supporting the Existing Credit Agreement Obligations.  Neither Party hereto shall have by reason of this Agreement or any

5

other document a fiduciary relationship with the other Party (or any other creditor, person or entity). The Parties recognize that the interests of the DIP Lender and Hercules (and any other creditor) may differ, and the DIP Lender may act in its own interest without taking into account the interests of any other creditor, including Hercules. Neither Party shall contest, or support any person in contesting, directly or indirectly, in any proceeding (including a bankruptcy or other insolvency proceeding) the validity, enforceability, perfection, characterization or priority of any lien on or security interest in the collateral securing or purportedly securing a DIP Obligation or the Existing Credit Agreement Obligations. Nothing in this Agreement shall be construed to prevent or impair the rights of Toshiba, the DIP Lender or Hercules to enforce this Agreement.

(d)     *Power of Attorney.*  Conditioned upon payment of the Hercules Paydown and approval in the Interim DIP Order of the Hercules Closing Paydown , Hercules hereby appoints the DIP Lender and any officer or agent of the DIP Lender (including with respect to any and all powers of attorney granted to Hercules under the Subordination Agreements), with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Hercules or in the DIP Lender's own name, in the DIP Lender's discretion to take any action and to execute any and all documents and instruments that may be reasonable and appropriate for the purpose of carrying out the terms hereof, including any endorsements or other instruments of transfer or release. This appointment is coupled with an interest and is irrevocable until the Discharge of DIP Obligations or such time as this Agreement is terminated in accordance with its terms. No Person to whom this power of attorney is presented, as authority for the DIP Lender (or any officer or agent of the DIP Lender) to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from Hercules as to the authority of the DIP Lender (or any such officer or agent of the DIP Lender) to take any action described herein, or as to the existence of or fulfillment of any condition to this power of attorney, which is intended to grant to the DIP Lender (or any officer or agent of the DIP Lender) the authority to take and perform the actions contemplated herein. Hercules irrevocably waives any right to commence any suit or action, in law or equity, against any person which acts in reliance upon or acknowledges the authority granted under this power of attorney. Hercules hereby ratifies all that said attorneys shall do or cause to be done in accordance with the power of attorney granted in this Section.

(e)     *Waiver.*  Hercules (i) waives any and all notice of the creation, renewal, extension or accrual of any of the DIP Obligations under the DIP Documents and notice of or proof of reliance by Hercules upon this Agreement and protest, demand for payment or notice except to the extent otherwise specified herein and (ii) acknowledges and agrees that the DIP Lender has relied upon the lien and security interest priority and other provisions hereof in entering into the DIP Documents and in making funds available to the Debtors thereunder.

(f)     *Sale of Collateral; Waivers.*  Notwithstanding anything to the contrary contained herein, Hercules will not, and shall use commercially reasonable efforts to enforce the Subordination Agreements to cause the Debenture Creditors not to, contest, protest, or object, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code, to a disposition of the collateral securing the Existing Credit Agreement Obligations and the Debenture Obligations, or the process or procedures for obtaining bids for and effecting a disposition of any such collateral (including the right of the DIP Lender to credit bid and the retention by the Debtors of professionals in connection with any potential disposition), or any

6

motion or order consistent with this Agreement in connection with any such disposition, process or procedures, under section 363 of the Bankruptcy Code (or any other provision of the Bankruptcy Code or applicable bankruptcy law), if the DIP Lender consents to such disposition, such process or procedures or such motion or order; *provided* that ,pursuant to court order, the liens of Hercules and Debenture Creditors attach to the net proceeds of the disposition with the same priority and validity as the liens and security interests held by Hercules and the Debenture Creditors on such collateral, and such liens and security interests remain subject to the terms of this Agreement and the Subordination Agreements.

        Section 3.      Representations and Warranties.

        (a)      Each of the Parties severally represents and warrants to each of the other Parties that the following statements are true and correct as of the date hereof:

        (1)      Power and Authority.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

        (2)      Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

        (3)      No Conflicts.  The execution, delivery, and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party or under its certificate of incorporation or by-laws (or other organizational documents), except, with respect to any Company Party, for any contractual obligation that would not have a material adverse effect on the business, assets, financial condition, or results of operations of the Company and its affiliates, taken as a whole.

        (4)      Binding Obligation.  This Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

        (5)      Proceedings.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

        (b)      Hercules represents and warrants to Toshiba that the following statements are true, correct, and complete as of the date hereof:

        (1)      Continuing Effect of Loan Documents.  The Existing Credit Agreement, and all related documents, including, without limitation, the Subordination Agreements, in the forms provided to Toshiba by the Debtors, and the Existing Credit

7

Agreement Obligations, are in full force and effect and have not been supplemented, modified or amended.

(2)    Ownership.  It is (i) the sole beneficial owner of any and all Existing Credit Agreement Obligations and (ii) entitled to all of the rights and economic benefits of all Existing Credit Agreement Obligations.

(3)    Transfers.  It has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in the obligations owed by the Company under the Existing Credit Agreement.

Section 4.    Termination.  This Agreement may be terminated:

(a)    By Toshiba, following written notice to Hercules, (i) upon termination of the Purchase Agreement in accordance with its terms, or (ii) on account of a material breach of Hercules' obligations hereunder.

(b)    By Hercules, following written notice to Toshiba, (i) upon termination of the Purchase Agreement in accordance with its terms, or (ii) on account of a material breach of Toshiba's obligations hereunder; _provided, however_, that Section 2 hereof shall survive and continue with full force and effect irrespective of any termination of this Agreement, as to any amounts extended to the Debtors by Toshiba under the DIP Facility through the date on which written notice of valid termination of this Agreement is actually received by Toshiba.

_provided, however_, that neither Toshiba nor Hercules may seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of its own actions or omissions.  On the delivery of the written notice of termination in connection with the valid termination of this Agreement, the obligations of each of the Parties hereunder shall thereupon terminate and be of no further force and effect.

Section 5.    Amendments.  This Agreement may not be modified, amended, or supplemented, or terms or provisions waived, except in writing signed by the Parties hereto.

Section 6.    Governing Law; Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws of the State of New York. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in a federal court of competent jurisdiction in the District of Delaware.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.  Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Bankruptcy Cases, each of the Parties hereto hereby agrees that the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement.

8

Section 7.      <u>Notices.</u>

Notices. All notices or other communications required or permitted under, or otherwise made in connection with, this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when delivered in person, (b) upon confirmation of receipt when transmitted by electronic mail, (c) upon receipt after dispatch by registered or certified mail, postage prepaid, or (d) on the next Business Day if transmitted by national overnight courier (with confirmation of delivery), in each case, addressed as follows:

If to Hercules, to:

Hercules Technology Growth Capital, Inc.
31 St. James Avenue, Suite 790
Boston, MA 02116
Attention:    Scott Bluestein
Email:        sbluestein@herculestech.com

with a copy (which shall not constitute notice) to:
Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
Hackensack, NJ 07602
Attention:    Stuart Komrower      skomrower@coleschotz.com
              Marc Press           mpress@coleschotz.com

If to Toshiba, to:

Legal Affairs Division
Semiconductor & Storage Products Company
Toshiba Corporation
1-1, Shibaura 1-chome
Minato-ku, Tokyo 105-8001, Japan
Attention:    Takahiro Asakura
Email:        takahiro.asakura@toshiba.co.jp

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
650 Town Center Drive, 20th Floor
Costa Mesa, California  92626
Attention:    Charles K. Ruck      Charles.Ruck@lw.com
              Robert Klyman        Robert.Klyman@lw.com
              Joshua M. Dubofsky   Josh.Dubofsky@lw.com

Section 8.      <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior agreements with respect to the subject matter hereof.

9

OC\1705799.10

Section 9.    <u>Headings</u>.  The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 10.    <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns; Toshiba may assign its rights hereunder to any Buyer Designee.

Section 11.    <u>Specific Performance</u>.  Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause other parties to sustain damages for which such parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such other parties shall be entitled to the remedy of specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which such parties may be entitled, at law or in equity.

Section 12.    <u>Several, Not Joint, Obligations</u>.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

Section 13.    <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such party.

Section 14.    <u>No Waiver</u>.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

Section 15.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by telecopier or email shall be as effective as delivery of a manually executed signature page of this Agreement.

Section 16.    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 17.    <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

Section 18.    <u>Additional Parties</u>.  Without in any way limiting the provisions hereof, additional Persons may elect to become Parties by executing and delivering to the Company a

10

counterpart hereof. Such additional holder shall become a Party to this Agreement as a Consenting Noteholder in accordance with the terms of this Agreement.

Section 19.    No Solicitation. This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance or rejection of a plan of reorganization for any of the Debtors.

Section 20.    Settlement Discussions. This Agreement and the Transactions are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

Section 21.    Fees and Expenses. Except as otherwise provided in the Purchase Agreement or the DIP Documents, each Party shall be solely responsible for all fees and expenses arising in connection with this Agreement and the Transactions, provided that in any dispute between the Parties based upon, relating to, or arising under this Agreement or the DIP Documents, the prevailing Party shall be entitled to payment of its reasonable attorneys' fees and costs by the non-prevailing Party.

Section 22.    Receipt of Adequate Information; Representation by Counsel. Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any party with a defense to the enforcement of the terms of this Agreement against such party shall have no application and is expressly waived. The provisions of the Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties.

Section 23.    Auction. Notwithstanding anything herein to the contrary, nothing in this Agreement limits, impairs, or alters the right or ability of either Party or any other Person to participate in the Auction in accordance with the Bidding Procedures Order, provided that such party shall in all events support the Sale.

Section 24.    Conflict with Other Documents. In the event of any conflict between the terms of this Agreement and any other agreement, instrument or document (including, but not limited to the Interim DIP Order, Final DIP Order and the Purchase Agreement), the terms of this Agreement shall govern as to the Parties.

**[Signature Pages Follow]**

11

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

**TOSHIBA CORPORATION**, a corporation organized under the laws of Japan

By: _____

Name: Yasuo Naruke
Title: Corporate Senior Vice President
       President & CEO
       Semiconductor & Storage Products Company

[Signature Page to Restructuring Support and Subordination Agreement]

IN WITNESS WHEREOF, the Parties hereto have duly executed and delivered this Agreement as of the date first above written.

**HERCULES TECHNOLOGY GROWTH CAPITAL, INC.**, a Delaware corporation

By: _____

Name: Michael Penney

Title: Secretary

**Exhibit A**

Purchase Agreement

OC\1705799.10

**[Intentionally Omitted]**

**Exhibit B**

Interim DIP Order

**[Intentionally Omitted]**